UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| BRITTANY WOOD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-00253-JAW |
| | ) | |
| PENOBSCOT COUNTY SHERIFF's DEPARTMENT, et al. | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

Addressing a pro se lawsuit by a former inmate under 42 U.S.C. § 1983, alleging denial of medical care and sexual harassment, the court grants summary judgment against the county and a sheriff because the plaintiff has failed to demonstrate that the county's policies and customs caused or contributed to either claim and because the plaintiff has failed to demonstrate that the sheriff participated individually in either claim or should be held vicariously liable for the actions of his subordinates. At the same time, the court concludes that the plaintiff's sexual harassment claims against two unknown corrections officers may proceed, subject to her identification of the two officers and her impleading them forthwith.

## I. PROCEDURAL BACKGROUND

On April 3, 2024, Brittany Wood, acting pro se, filed a civil action pursuant to 42 U.S.C. § 1983 against Penobscot County Jail (PCJ) in Penobscot County Superior Court and on June 26, 2024, Ms. Wood filed an amended complaint, adding Troy Morton, the Penobscot County Sheriff, and four John Doe employees or agents of the

PCJ. *See Notice of Removal*, Attachs. 2, *State Ct. Docket*, and 3, *Am. Compl.* On July 15, 2024, the Defendants removed the case to this Court on the basis of its federal question jurisdiction. *Notice of Removal* (ECF No. 1). On July 15, 2024, PCJ and Sheriff Morton filed an answer to the amended complaint with affirmative defenses. *Answer and Affirmative Defenses of Defs. Penobscot Cnty. Jail and Sheriff Troy Morton* (ECF No. 3). As Ms. Wood's amended complaint had not been acted on before removal, on October 24, 2024, Ms. Wood filed a motion to amend complaint, which the Magistrate Judge granted on the same day. *Mot. to Amend Pleadings* (ECF No. 12); *Order* (ECF No. 13). Later on October 24, 2024, Ms. Wood filed a second motion to amend complaint with an attached proposed second amended complaint, impleading the Penobscot County Sheriff's Department and dropping the PCJ. *Mot. to Amend Pleadings* (ECF No. 14). On November 19, 2024, the Magistrate Judge granted this motion to amend complaint without objection.[1] *Order* (ECF No. 19).

After a somewhat contentious period of discovery, on December 11, 2025, the Defendants filed a motion for summary judgment and a statement of undisputed material facts. *Defs.' Mem. of Law in Suppt. of Summ. J.* (ECF No. 74) (*Defs.' Mot.*); *Defs.' Statement of Undisputed Material Facts* (ECF No. 75) (DSMF). On April 6, 2026, Ms. Wood filed her opposition to the County Defendants' motion for summary judgment, *Pl.'s Opp'n to Defs.' Mot. for Summ. J. With Incorporated Memo. of L.* (ECF No. 90) (*Pl.'s Opp'n*), as well as an opposition to the Defendants' statement of material facts, and a statement of additional material facts. *Pl.'s Opp'n to Defs.' Statement of*

---

[1] On November 19, 2024, the Magistrate Judge also dismissed as moot an orphan motion to amend complaint that Ms. Wood filed on October 24, 2024. *See Order* (ECF No. 20).

*Mat. Facts & Statement of Addt'l Material Facts in Opp'n to Mot. for Summ. J.* (ECF No. 91) (PRDSMF/PSAMF). On August 7, 2026, the Defendants filed a reply to Ms. Wood's response, *Defs.' Reply Mem. in Suppt. of Summ. J.* (ECF No. 112) (*Defs.' Reply*), and a reply to her additional statement of material facts. *Defs.' Reply Statement of Material Facts and Resp. to Pl.'s Objs. and Statement of Addt'l Material Fact*[2] (ECF No. 113) (DRPSAMF).[3]

## II. BRITTANY WOOD'S SECOND AMENDED COMPLAINT

In her second amended complaint, Ms. Wood does not break down her allegations into counts. *Mot. to Amend Pleadings*, Attach. 1, *Second Am. Compl.* at 1-5 (ECF No. 14). However, broadly speaking, Ms. Wood alleges that the Defendants violated her civil rights in two ways: (1) being deliberately indifferent to her medical needs, resulting in an emergency hospitalization during which she required life-saving treatment, and (2) throughout her period of incarceration subjecting Ms. Wood to a pattern of sexual harassment. *Id.*

---

[2] On August 7, 2026, the Defendants filed three different replies in the same document. They filed a reply to her statements of additional material facts, which is a standard Rule 56 document authorized by Local Rule 56(d). *See Defs.' Repl. Statement of Material Facts and Resp. to Pl.'s Objs. and Statement of Addit'l Material Fact* at 19-29.

They also filed what they entitle, "Reply Statement of Material Fact" consisting of thirty-six new paragraphs, *see id.* at 1-7, and what they entitle, "Defendant's Rule 56(e)(2) Response to Wood's Objections to Their Statement of Material Facts." Neither of these filings is authorized by Local Rule 56 and the Court has not considered them. The Reply Statement of Material Facts is obviously not authorized. Not only is there no provision in either Rule 56 or Local Rule 56 for such a statement, there is no provision for the non-movant to file a sur-reply to such a reply. As for Rule 56(e)(2), the Rule provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . ., the court may . . . (2) consider the fact undisputed for purposes of the motion." FED. R. CIV. P. 56(e). Any Rule 56(e)(2) objections should be incorporated in the Defendants' reply under Local Rule 56(d) and made specific to each assertion by Ms. Wood.

[3] The docket reflects several controversies between the parties leading up to the filing of these documents; however, the Magistrate Judge was able ultimately to resolve these disputes, and they are not relevant to the pending dispositive motion.

## III. STATEMENT OF UNCONTESTED FACTS

### A. Brittany Wood's Dates of PCJ Incarceration

The relevant sequence of events begins in September 2017 when Ms. Wood was arrested and charged with drug-related offenses. PSAMF ¶ 1; DRPSAMF ¶ 1. On September 12, 2017, Ms. Wood was arrested for drug trafficking and briefly incarcerated at PCJ. DSMF ¶ 1; PRDSMF ¶ 1. Ms. Wood was arrested again on October 2, 2017 and incarcerated at PCJ until October 4, 2017. DSMF ¶ 2; PRDSMF ¶ 2.[4]

On January 26, 2018, Ms. Wood was arrested again and incarcerated at PCJ until January 29, 2018. DSMF ¶ 3; PRDSMF ¶ 3. Ms. Wood does not have any independent memory of the three days she was incarcerated at PCJ in January 2018 and is not able to describe anything that she claims happened to her during that incarceration related to this lawsuit.[5] DSMF ¶ 3; PRDSMF ¶ 3.

---

[4] The second sentence of DSMF ¶ 2 states that "Wood does not allege that any sexual misconduct or harassment occurred during this incarceration." DSMF ¶ 2. Ms. Wood denied this statement but provided no citation for her denial. PRDSMF ¶ 2. To support its second sentence, the Defendants cite Ms. Wood's deposition transcript. DSMF ¶ 2 (citing *Dep. Tr. of Brittany Wood* at 63:14-25 (ECF No. 75, Attach. 2) (*Wood Dep.*)). The Court rejects the Defendants' second statement for several reasons. First, the Defendants elected to provide the Court with an incomplete transcript. Page 63, cited by the Defendants, starts with an incomplete question, and the Court does not know what question Ms. Wood was responding to. Second, in the upper part of page sixty-three, Ms. Wood clearly states that she had been sexually harassed "the entire time" when she had been incarcerated at PCJ. *Wood Dep.* at 63:2-13. Third, it is clear in reviewing the transcript that counsel for the Defendants asked her a "yes or no" question about whether she was alleging that "any specific thing" happened to her at PCJ between October 2, 2017 and October 4, 2017, and she responded, "No. I guess if I only have two options, it's no." *Id.* at 14-25. Viewing her answers in the light most favorable to Ms. Wood, she had alleged that she had been sexually harassed whenever she was incarcerated at PCJ but was not making an allegation of anything specific regarding her October 2-4, 2017 PCJ incarceration. Thus, the Court rejects the Defendants' second sentence as mischaracterizing the transcript.

[5] The Defendants' second sentence states that "Wood does not allege that any sexual misconduct or harassment occurred during this incarceration." DSMF ¶ 3. Ms. Wood denies this second sentence. PRDSMF ¶ 3. Here, Ms. Wood's deposition response is clearer, and the Defendants provided a complete transcript of this interchange. To be precise, Ms. Wood acknowledged that she did not have

On February 22, 2018, Ms. Wood was arrested again. DSMF ¶ 4; PRDSMF ¶ 4. Her bail was revoked, and she was incarcerated at PCJ for approximately five weeks. DSMF ¶ 4; PRDSMF ¶ 4. Ms. Wood remained incarcerated at PCJ until March 31, 2018, when she was taken by ambulance to Eastern Maine Medical Center (EMMC). DSMF ¶ 5; PRDSMF ¶ 5. Ms. Wood was hospitalized at EMMC until April 13, 2018. DSMF ¶ 6; PRDSMF ¶ 6. Ms. Wood left EMMC on April 13, 2018 against medical advice after Sheriff Morton granted her a medical furlough from custody. DSMF ¶ 7; PRDSMF ¶ 7.

**B. Penobscot County Jail Policies and Procedures: Medical Care**

On May 14, 2018, Ms. Wood was arrested again and was incarcerated at the PCJ until July 12, 2018, when she was transferred to the Washington County Jail (WCJ). DSMF ¶ 8; PRDSMF ¶ 8. Ms. Wood remained incarcerated at the WCJ until August 23, 2018. DSMF ¶ 8; PRDSMF ¶ 8. On May 23, 2018, Ms. Wood signed an "Inmate/Resident Acknowledgement of Prohibition on Sexual Misconduct" form, which confirmed in part that Ms. Wood "received the Inmate handbook which outlines [PCJ's] 'Zero Tolerance' policy on sexual misconduct" and stated that Ms. Wood understood that she "[had] a right to report if sexual misconduct occurs."[6] DSMF ¶ 9; PRDSMF ¶ 9. Except for first aid, cardiopulmonary resuscitation, and emergency responses, PCJ employees do not administer healthcare or medical care directly to

an independent memory of those three days of incarceration and therefore could not relate anything that happened to her during that incarceration. *Wood Dep.* at 64:1-16. The Court amended DSMF ¶ 3 to accurately reflect the transcript testimony.

[6] Ms. Wood admits she signed the document but objects to this paragraph on the ground that the document speaks for itself. PRDSMF ¶ 9. The Court overrules her objection.

inmates.[7] DSMF ¶ 10; PRDSMF ¶ 10; DSMF ¶ 21; PRDSMF ¶ 21. Corrections officers at PCJ receive training on PCJ policies and procedures, including the policies concerning medical services (F-310), emergency medical services (F-311), and non-emergency medical services (F-312).[8] DSMF ¶ 22; PRDSMF ¶ 22.

Penobscot County contracts with a medical provider to provide healthcare and associated medical services to inmates at PCJ. DSMF ¶ 11; PRDSMF ¶ 11. In 2018, the contracted medical provider at PCJ was MedPro Associates. DSMF ¶ 12; PRDSMF ¶ 12. The PCJ's healthcare provider is responsible for providing emergency and non-emergency care to inmates. DSMF ¶ 13; PRDSMF ¶ 13. The healthcare provider administers routine, non-emergency medical care in a designated area of the

---

[7] The Defendants' paragraph 10 states: "Penobscot County employees do not administer healthcare or medical care to inmates directly." DSMF ¶ 10. Paragraph 10 is consistent with an affidavit of Lieutenant Jason Raymond. *See Defs.' Mot.* Attach. 6, *Aff. of Lt. Jason Raymond* ¶ 3. Citing Lt. Raymond's deposition testimony, Ms. Wood objects, noting that Lt. Raymond testified that PCJ employees are trained to administer emergency first assistance. PRDSMF ¶ 10. The Court reviewed Lt. Raymond's deposition transcript, and Ms. Wood is correct. Lt. Raymond testified that all PCJ corrections employees are CPR certified through the American Heart Association and its supervisors are first aid and CPR certified through the American Heart Association. *Defs.' Mot.* Attach. 8, *Zoom Dep. of Lt. Jason Raymond* 35:15-36:2 (*Raymond Dep.*). Also, he testified that upon notice of a medical emergency, a PCJ staff member would call all staff and medical to respond, and the supervisor and the medical provider would respond to that signal and handle it accordingly. *Id.* 34:21-35:5. Finally, PCJ policy requires correction personnel to "promptly implement emergency medical procedures to ensure that inmates who are in need of emergency medical attention receive it." *Defs.' Mot.* Attach. 11, *Emerg. Med. Procedures* No. F-311 at 1 (F.311). Viewing the record in the light most favorable to Ms. Wood, the Court has altered the Defendants' paragraph 10 to conform to Lieutenant Raymond's deposition testimony and PCJ policy, not his affidavit.

The Defendants reiterate this asserted fact in DSMF paragraph 21, asserting that corrections officers at PCJ do not provide healthcare. DSMF ¶ 21. Ms. Wood objects on the ground that the provision of CPR or emergency care is healthcare. PRDSMF ¶ 21. The Court agrees with Ms. Wood and has deleted the reference in DSMF paragraph 21 to the Defendants' assertion that corrections officers do not provide healthcare.

[8] Ms. Wood objects to DSMF paragraph 22 on the ground that the statement is found only Lieutenant Raymond's affidavit, not his deposition. PRDSMF ¶ 22. The Court overrules Ms. Wood's objection. There is no evidence that on this point, Lieutenant Raymond's affidavit contradicts as opposed to supplements his deposition testimony.

Jail called the Health Clinic.[9] DSMF ¶ 14; PRDSMF ¶ 14. Inmates with non-emergency medical concerns are directed to complete an inmate medical request form.[10] DSMF ¶ 15; PRDSMF ¶ 15.

Corrections officers have medical request forms and these forms are handed out to inmates who request them.[11] DSMF ¶ 15; PRDSMF ¶ 15. According to PCJ policy, at least once per day, the Health Care nursing staff collect, review, and, if appropriate, directly evaluate the inmate. DSMF ¶ 16; PRDSMF ¶ 16. If the medical provider determines that it is appropriate, then nursing staff directly evaluates an inmate who has requested non-emergency medical care.[12] DSMF ¶ 17; PRDSMF ¶ 17. According to PCJ policy, the Health Care Provider conducts "Sick Call" at least

---

[9] Ms. Wood objected to DSMF paragraph 14 on the ground that the document speaks for itself and in her experience MedPro was negligent in providing healthcare. PRDSMF ¶ 14. The Court overrules both objections.

[10] Ms. Wood interposed a qualified response to DSMF paragraph 15 on the ground that the document speaks for itself and she could neither admit nor deny the paragraph. PRDSMF ¶ 15. The Court declines to accept the qualified response and treats DSMF paragraph 15 as admitted.

[11] DSMF paragraph 16 states:

> At least once per day, corrections officers collect inmate health request forms and deliver them to the contracted medical provider, who reviews each inmate medical request and provides care as they determine to be necessary.

DSMF ¶ 16. Ms. Wood objects to this paragraph on the ground that the Defendants' references do not support the paragraph. PRDSMF ¶ 16. Ms. Wood is correct in part. Lt. Raymond states in his deposition that the staff hands out the medical request forms to inmates on request, *Raymond Dep.* at 34:10-20, and the staff member would receive the form back from the inmate and deliver it to the medical provider. *Id.* PCJ policy makes it clear that at least once per day, the Health Clinic nursing staff collects, reviews, and if appropriate, directly evaluates the inmate. *Defs.' Mot.* Attach. 10, *Non-Emerg. Med. Procedures* No. F-312 at 1 (F-312). The Court has altered DSMF paragraph 16 to conform to PCJ's policy.

[12] Ms. Wood objects to this paragraph on the ground that the reference to PCJ Policy F-312 does not support the proposition. PRDSMF ¶ 17. The Court reviewed the cited policy and disagrees with Ms. Wood.

twice per week for inmates who have submitted requests for non-emergency medical care, and urgent medical concerns to be evaluated.[13] DSMF ¶ 18; PRDSMF ¶ 18.

PCJ's policy on emergency medical procedures defines an "emergency medical situation" as "any medical [condition] such as, but not limited to, severe bleeding, unconsciousness, serious breathing difficulties . . . that, without immediate medical treatment, would adversely affect a person's health." DSMF ¶ 19; PRSAMF ¶ 19. Under PCJ policy, if a corrections officer discovers an inmate in need of emergency medical attention, they must announce a "Signal 1000" medical emergency and immediately notify the Shift Supervisor through the most direct means available informing them of a) an emergency situation, the condition and location of the inmate, b) a need to immediately contact the ambulance if the situation is obviously life-threatening, unless otherwise directed by Health Clinic Personnel, and c) administer first aid if necessary.[14] DSMF ¶ 20; PRDSMF ¶ 20.

All county jails in the state of Maine, including PCJ, are required to comply with medical care standards set by the Maine Department of Corrections. DSMF ¶ 23; PRDSMF ¶ 23.[15]

---

[13] Ms. Wood denies DSMF paragraph 18 on the ground that while she was at PCJ, the medical provider did not conduct sick calls twice per week. PRDSMF ¶ 18. The Court reviewed the Defendants' citation and it is to the policy, not to actual practice. *See* F-312 at 2. In response to her objection and based on Defendants' citation, the Court has amended DSMF paragraph 18 to clarify that paragraph 18 is addressing PCJ policy, not practice.

[14] Ms. Wood qualifies and objects to DSMF paragraph 20. PRDSMF ¶ 20. She admits that DSMF paragraph 20 accurately reflects PCJ policy, but she contends that the actual practice is not supported by the portion of Lieutenant Raymond's deposition testimony. PRDSMF ¶ 20. The Court agrees that Lieutenant Raymond's testimony does not contain the detail set forth in the policy. It has therefore amended DSMF paragraph 20 to clarify that it reflects PCJ policy, not practice.

[15] DSMF paragraph 24 states that "[n]ew inmates at the [PCJ] receive an inmate handbook which provides information on how to access healthcare while incarcerated at the Jail." DSMF ¶ 24; PRDSMF ¶ 24. Ms. Wood objects on the ground that Lieutenant Raymond's affidavit does not state

### C. Penobscot County Jail: Policies and Procedures: Sexual Misconduct

#### 1. Sexual Misconduct Policy

The Penobscot County Sheriff's Office (PCSO) has a policy prohibiting all forms of sexual misconduct and sexual harassment, regardless of whether that behavior constitutes a violation of federal or state law.[16] DSMF ¶ 25; PRDSMF ¶ 25. The PSCO's zero-tolerance policy against sexual misconduct and sexual harassment was in place in 2018.[17] DSMF ¶ 26; PRDSMF ¶ 26. Among other things, the PCJ's sexual misconduct policy prohibits "invasion of the privacy of an unclothed or partially clothed inmate or resident, or voyeurism for reasons unrelated to official duties or for the purpose of arousing or gratifying sexual desire."[18] DSMF ¶ 27; PRDSMF ¶ 27. The PCJ's sexual misconduct policy prohibits staff with supervisory or disciplinary authority over an inmate from "unlawful sexual touching," which is defined as "[a]ny intentional touching, consensual or nonconsensual, of the groin, breast, inner thigh,

---

when PCJ adopted this practice. PRDSMF ¶ 24. The Court agrees that Lieutenant Raymond's affidavit is written in the present tense, *see Raymond Aff.* ¶ 8, and otherwise does not indicate when PCJ adopted this practice. What PCJ does now in informing inmates about access to healthcare services is not relevant to what it did in 2018. Thus, the Court has not included DSMF paragraph 24.

[16] Ms. Wood objects to DSMF paragraph 25 on the ground that it lacks "temporal context." PRDSMF ¶ 25. The Court overrules this objection. The Defendants cite PCJ's sexual misconduct policy no. F-324, which is attached to their motion. DSMF ¶ 25 (citing *Def.'s Mot.* Attach. 12, *Sexual Misconduct (PREA and Maine Statutes) General. No. F324* at 1-7 (F-324). The policy is dated November 1, 2016 and in Lieutenant Raymond's deposition, he confirms that F-324 was in effect during Ms. Wood's incarceration. *Raymond Dep.* at 49:5-7.

[17] Ms. Wood denies and objects to DSMF paragraph 26. PRDSMF ¶ 26. The Defendants assert that PCJ's zero-tolerance policy existed before, during and after her incarceration. DSMF ¶ 26. Ms. Wood says that the cited record allows only a conclusion that the zero-tolerance policy existed during her incarceration. The Court agrees with Ms. Wood and has altered DSMF ¶ 26 accordingly.

[18] Ms. Wood objects to DSMF paragraph 27 on the ground that the Defendants have not established that this sexual misconduct policy was in force when she was at PCJ. PRDSMF ¶ 27. The Court disagrees and concludes that the record contains sufficient evidence that this policy was in effect when Ms. Wood was an inmate.

or buttocks, directly or through clothing, directed toward an inmate."[19] DSMF ¶ 28; PRDSMF ¶ 28. The PCJ's sexual misconduct policy designates a PREA[20] monitor, whose duties include ensuring that all inmates receive timely, comprehensive education regarding their rights to be free from sexual misconduct and sexual harassment; reporting all PREA related complaints and alleged incidents to the PREA coordinator immediately after learning of the complaint or allegation; and conducting and documenting unannounced rounds to identify and deter staff sexual misconduct and sexual harassment.[21] DSMF ¶ 29; PRDSMF ¶ 29.

#### 2. Training Regarding Prohibition on Sexual Misconduct

Currently and in 2018, PCJ has a policy that requires PCJ staff and corrections officers to receive training with respect to sexual harassment and the Penobscot County's zero-tolerance policy for sexual misconduct; the right of inmates to be free from sexual misconduct and sexual harassment; and the right of inmates to be free from retaliation for reporting sexual misconduct and sexual harassment.[22] DSMF

---

[19] Ms. Wood qualifies her response to DSMF paragraph 27 and objects to it. PRDSMF ¶ 27. She repeats her foundational concerns about the policy, which the Court has overruled, and says that her experience at PCJ did not reflect the policy which, however true, does not contradict that PCJ had adopted the policies contained in DSMF paragraph 27. The Court overrules her objection and declines to accept her qualification.

[20] PREA stands for the Prison Rape Elimination Act, 34 U.S.C. §§ 30301-09. In DSMF ¶ 29, n.1, the Defendants provide what appears to be an incorrect citation for PREA as 42 U.S.C. §§ 15601, et seq.

[21] Ms. Wood qualifies her response to DSMF ¶ 29 and objects to it, PRDSMF ¶ 29, for the same reasons set forth in the preceding footnote. The Court overrules her objection and declines to accept her qualification for the same reason described above.

[22] Ms. Wood first objects to DSMF paragraphs 30 and 31 on the ground that the policy is not self-authenticating. PRDSMF ¶¶ 30-31. In their DSMF, the Defendants cite an unhelpful portion of Lieutenant Raymond's deposition testimony to authenticate the PCJ's sexual misconduct prevention policy. *See* DSMF ¶ 30 (citing *Raymond Dep.* at 41:12-15). The Court, however, came upon Lieutenant Raymond's testimonial reference to the Sexual Misconduct (PREA and Maine Statutes) Prevention policy. *See Raymond Dep.* at 43:2-50:3. The Court concludes based on its review of Lieutenant Raymond's testimony and the Policy No. 324.2 that the document is what the proponent claims it is, and satisfies Federal Rule of Evidence 901(a). Ms. Wood also objects on the ground that the fact the

¶ 30; PRDSMF ¶ 30. This training includes how to comply with relevant laws related to mandatory reporting of sexual misconduct to outside authorities; how to avoid inappropriate relationships with inmates, residents, and persons under supervision in the community; how to detect and respond to signs of threatened and actual sexual misconduct; how staff are required to fulfill their responsibilities with respect to sexual misconduct and sexual harassment prevention, detection, reporting, and response; and how to communicate effectively and professionally with inmates, residents, and persons under supervision in the community. DSMF ¶ 31; PRDSMF ¶ 31. Newly admitted inmates at the PCJ are made aware of their rights and protection against sexual harassment and sexual assault and must sign a written acknowledgement form acknowledging that they have been provided with this information.[23] DSMF ¶ 32; PRDSMF ¶ 32.

### 3. Reporting and Investigation of Sexual Misconduct

The PCJ's sexual misconduct policy in 2018 provided that any inmate who was made to feel uncomfortable or sexually harassed by a corrections officer had a number of different options for making a report.[24] DSMF ¶ 33; PRDSMF ¶ 33. These options

---

PCJ has a policy does not mean that that PCJ staff and corrections officers actually receive the training. PRDSMF ¶ 30. The Court accepts Ms. Wood's point and has altered DSMF ¶ 30 accordingly.

[23] Ms. Wood objects to DSMF paragraph 32 on the ground that Lieutenant Raymond's testimony does not address the comprehensiveness of these instructions. PRDSMF ¶ 32. The Court sustains Ms. Wood's objection. The cited record does not allow the conclusion that the instructions constitute a comprehensive education. Finally, the Court sustains Ms. Wood's objection to the inmates being given a safety memo. The Defendants' cited transcript does not mention safety instructions and the Court has not included this reference in the statement of facts.

[24] Ms. Wood objects to DSMF paragraph 33 on the ground that Lieutenant Raymond did not testify at his deposition that the PCJ policy "required" inmates to have several ways of reporting sexual misconduct or harassment. PRDSMF ¶ 33. She is correct, at least as regards the portion of the Raymond deposition that the Defendants cite. The Court agrees that the word, "required", is an odd fit for the Defendants' point. The policy corroborated by Lieutenant Raymond's testimony provided for several means for inmate complaints, and the Court has amended DSMF paragraph 33 accordingly.

included a free, anonymous, 24-hour telephone hotline to which all PCJ inmates have access and which they may use to contact a sexual assault liaison and report an incident of sexual harassment or sexual assault.[25] DSMF ¶ 34; PRDSMF ¶ 34. The hotline is operated by a sexual assault advocacy group called Rape Response and makes sexual assault counselors available to inmates who call the hotline.[26] DSMF ¶ 35; PRDSMF ¶ 35. Inmates do not require permission from PCJ staff to use the hotline. DSMF ¶ 35; PRDSMF ¶ 35. PCJ inmates or their friends or family members may also direct complaints of sexual harassment or sexual assault to the Maine Department of Corrections Mountain View Correctional Center.[27] DSMF ¶ 36; PRSAMF ¶ 36. PCJ inmates may also report sexual harassment or sexual assault to any PCSO staff, volunteer, student intern, another PCJ inmate, or to medical or mental health clinicians.[28] DSMF ¶ 37; PRDSMF ¶ 37. The PREA Coordinator is required to keep the identity of the person reporting sexual misconduct confidential if requested. DSMF ¶ 38; PRDSMF ¶ 38.

The PCJ's sexual misconduct policy requires that inmates be provided with the means to report sexual misconduct or sexual harassment in the community,

---

[25] Ms. Wood objects to DSMF paragraph 34 on the ground that the statement is not supported by the citation. PRDSMF ¶ 34. The Court disagrees and overrules her objection.

[26] Ms. Wood objects to DSMF paragraph 35 on the ground that the statement is not supported by the citation. PRDSMF ¶ 35. The Court disagrees and overrules her objection.

[27] Ms. Wood objected to DSMF paragraph 36 on the ground that the Defendants have not qualified Lieutenant Raymond to testify regarding the internal processes at the Mountain View Correctional Facility. PRDSMF ¶ 36. Lieutenant Raymond was the individual designated as the PCJ's Rule 30(b)(6) witness and is the Assistant Administrator of the PCJ, and he was testifying about the Department of Corrections contract with PCJ through Mountain View Correctional Facility. The Court overrules Ms. Wood's objection.

[28] Ms. Wood interposes a qualified response to DSMF paragraph 37 on the ground that during her incarceration, inmates were not free to report sexual harassment or misconduct. PRDSMF ¶ 37. The Court addresses her assertion in ruling on Ms. Wood's statement of additional material facts.

specifically the contact information for local agencies.[29] DSMF ¶ 39; PRDSMF ¶ 39. An inmate who alleges that they were a victim of sexual misconduct by a PCJ staff member may file an inmate grievance, which may be submitted as a letter, or an inmate grievance form supplied by a corrections officer or by another writing.[30] DSMF ¶ 40; PRDSMF ¶ 40. There is no time limit to filing an inmate grievance concerning sexual misconduct by a PCJ staff member.[31] DSMF ¶ 41; PRDSMF ¶ 41.[32] [33] [34] PCJ staff are prohibited from discouraging any person from reporting

---

[29] Though she admitted that the cited language appears in the document, Ms. Wood qualifies her response to DSMF paragraph 39 on foundational grounds. DSMF ¶ 39. The Court overrules her objection and qualification.

[30] Ms. Wood objects to DSMF paragraph 40, but she does not say why. PRDSMF ¶ 40. The Court deems DSMF paragraph 40 admitted.

[31] Though she admitted that the cited language appears in the document, Ms. Wood qualifies her response to DSMF paragraph 41 on foundational grounds. DSMF ¶ 41. The Court overrules her objection and qualification.

[32] DSMF paragraph 42 states that "PCJ personnel must provide a grievance form to any inmate who requests one." Ms. Wood objects to this paragraph as unsupported by the Defendants' citation. PRDSMF ¶ 42. As far as the Court can determine, Ms. Wood is correct. The Defendants' citation is only an "*id*." *See* DSMF ¶ 42. The "*id*" refers to Defendants' citation in DSMF paragraph 41, which states "[t]here is no time limit on the filing of the grievance". DSMF ¶ 41. The Court could not locate within Exhibit 15 a statement that PCJ personnel must provide a grievance form to any inmate who requests one. The Court has not included DSMF paragraph 42.

[33] DSMF paragraph 43 states:

> Completed grievance forms can be submitted to a corrections officer, assistant shift supervisor, or shift supervisor, who sign and date the form and return a pink "inmate copy" and then forward the form to the shift supervisor.

Ms. Wood objects to DSMF paragraph 43 because the Defendants cite a PCJ document that postdates her incarceration and because the Defendants cite a portion of Lieutenant Raymond's deposition testimony that does not substantiate the statement. PRDSMF ¶ 43. The Court agrees with Ms. Wood and has excluded DSMF paragraph 43.

[34] DSMF paragraph 44 states:

> If the PCJ administration's response to an inmate grievance is not acceptable to the inmate, the inmate can directly appeal to the Maine Department of Corrections.

Ms. Wood objects, stating that DSMF paragraph 44 is not remotely supported by the cited testimony. PRDSMF ¶ 44. The Court agrees with Ms. Wood and has excluded DSMF paragraph 44.

sexual misconduct or from retaliating against any person who does so.[35] DSMF ¶ 45; PRDSMF ¶ 45. Retaliation against an inmate who in good faith files an inmate grievance concerning sexual misconduct by a PCJ staff member is forbidden.[36] DSMF ¶ 46; PRDSMF ¶ 46.

Any PSCO staff who receives a report of sexual misconduct, or who witnesses or discovers it, is required to verbally report it to the PCJ's PREA coordinator immediately and then make a written report to the PCJ's PREA monitor before leaving their shift for the day.[37] DSMF ¶ 47; PRDSMF ¶ 47. In 2018, a complaint of sexual misconduct made by an inmate would be referred to the PCSO's Criminal Investigative Division (CID).[38] DSMF ¶ 48; PRDSMF ¶ 48. Detectives from the CID are law enforcement officers employed by the PCSO but do not work at or in the PCJ. DSMF ¶ 48; PRDSMF ¶ 48. An investigation into sexual misconduct may not be terminated due to the release of the alleged victim from custody.[39] DSMF ¶ 49;

---

[35] Ms. Wood objects to DSMF paragraph 45 on foundational grounds and because she says the policy is not adhered to. PRDSMF ¶ 45. The Court overrules the foundational objection and overrules the remaining objection because DSMF paragraph 45 describes the policy, not the practice.

[36] DSMF paragraph 46 originally read:

> Retaliation against an inmate who files an inmate grievance concerning sexual misconduct by a PCJ staff member is forbidden.

In her objection, Ms. Wood notes that the Defendants omitted the phrase in the policy which states that the anti-retaliation provision applies only to inmates who use the grievance "in good faith." PRDSMF ¶ 46. Ms. Wood is correct, and the Court amended DSMF paragraph 46 to conform more closely to the language of the policy.

[37] Ms. Wood admits that the language in DSMF paragraph 47 appears in the policy, but she denies that the policies reflect the actual conditions in the PCJ. PRDSMF ¶ 47. The Court overrules Ms. Wood's objection and qualification because DSMF paragraph 47 deals with policy, not practice.

[38] Ms. Wood objects to DSMF paragraph 48 on the ground that the paragraph contains more than one factual assertion in violation of Local Rule 56(b)(1). PRDSMF ¶ 48. The Court overrules this objection.

[39] Referring to her objection to DSMF paragraph 25, Ms. Wood objects to DSMF paragraph 49 on foundational grounds. PRDSMF ¶ 49. The Court incorporates its ruling on DSMF paragraph 25 and overrules Ms. Wood's objection.

PRDSMF ¶ 49. An investigation into sexual misconduct may not be terminated due to the suspected perpetrator's resignation or termination of employment.[40] DSMF ¶ 50; PRDSMF ¶ 50.

### D. Brittany Wood's Illness and Hospitalization

When Ms. Wood walked into PCJ in September 2017, she was twenty-seven years old without any health concerns.[41] PSAMF ¶ 8; DRPSAMF ¶ 8. She was in good health. PSAMF ¶ 8; DRPSAMF ¶ 8. She left PCJ by ambulance in what she recalls as critical condition. PSAMF ¶ 8; DRPSAMF ¶ 8. Ms. Wood's health issues began around one month into her incarceration. PSAMF ¶ 9; DRPSAMF ¶ 9. After approximately a week of having an upset stomach, her health deteriorated rapidly. PSAMF ¶ 9; DRPSAMF ¶ 9. Ms. Wood began vomiting daily, and this escalated until she could no longer keep food down. PSAMF ¶ 10; DRPSMF ¶ 10.

The medical emergency came after several weeks of ignored pleas and requests for competent medical attention. PSAMF ¶ 8; DRPSAMF ¶ 8. Throughout this process, she asked for help from numerous corrections officers and other PCJ staff. PSAMF ¶ 10; DRPSMF ¶ 10. Ms. Wood's requests were largely ignored and blamed

---

[40] Referring to her objection to DSMF paragraph 25, Ms. Wood objects to DSMF paragraph 50 on foundational grounds. PRDSMF ¶ 50. The Court incorporates its ruling on DSMF paragraph 25 and overrules Ms. Wood's objection.

[41] The Defendants interpose a qualified response to PSAMF paragraph 8 and move to strike it on the grounds that the statement contradicts Ms. Wood's prior testimony. DRPSAMF ¶ 8. The Court overrules the Defendants' objection because the contents of PSAMF paragraph 8 do not clearly contradict her prior testimony. The Defendants are correct that "where a party has given clear answers to unambiguous questions in discovery, that party cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory,' unless there is a satisfactory explanation of why the testimony [has] changed." *Escribano-Reyes v. Prof'l Hepa Certificate Corp.*, 817 F.3d 380, 386 (1st Cir. 2016) (internal punctuation omitted). But the prior testimony has to be a clear answer in response to an unambiguous question. Here, the Court does not consider the *Escribano-Reyes* rule to be implicated in this statement.

on her and she was told it was only in her head.[42] PSAMF ¶ 10; DRPSMF ¶ 10. In addition to personally asking corrections officers to inform medical staff that she needed assistance, she also submitted written requests for help.[43] PSAMF ¶ 11; DRPSAMF ¶ 11. Ms. Wood's cellmates also asked for help for her once she was no longer able to function physically. PSAMF ¶ 11; DRPSAMF ¶ 11.

On February 25, 2018, Ms. Wood was examined by Bryan Hunter, a nurse at the PCJ, after Ms. Wood had complained of severe pain in her left ear. DSMF ¶ 51; PRDSMF ¶ 51. Nurse Hunter was not a PCJ employee; in 2018, he was employed by MedPro Associates, the PCJ's contracted medical provider at the time.[44] DSMF ¶ 52; PRDSMF ¶ 52. Nurse Hunter found that Ms. Wood had cervical adenopathy, i.e., swollen glands, and some ear wax.[45] DSMF ¶ 53; PRDSMF ¶ 53. Because Ms. Wood did not complain of dizziness and had no drainage from her ear, Nurse Hunter followed the nursing intervention routine for earaches and placed her on a course of

---

[42] The Defendants interpose a qualified response to PSAMF paragraph 10 and move to strike it on the ground that the statement contradicts Ms. Wood's prior testimony. DRPSAMF ¶ 10. The Court overrules the Defendants' objection and declines the request to strike, because the contents of PSAMF paragraph 10 do not clearly contradict her prior testimony and to implicate *Escribano-Reyes*, the prior testimony has to be a clear response to an unambiguous question.

[43] The Defendant admitted PSAMF paragraph 11 but qualified their response. DRPSAMF ¶ 11. The Defendants refer to Ms. Wood's written inmate medical request dated March 29, 2018. DRPSAMF ¶ 11. The Court declines to accept the Defendants' qualified response, because the Court is required to view the record in the light most favorable to the non-movant.

[44] Ms. Wood interposes a qualified response to DSMF paragraph 52 on the ground that, although not a County employee, Nurse Hunter was the County's agent. PRDSMF ¶ 52. The Court overrules Ms. Wood's qualified response as non-responsive to the facts asserted in DSMF paragraph 52.

[45] Ms. Wood objects to DSMF paragraph 53 on the ground that Nurse Hunter's affidavit does not establish that he had personal knowledge of the contents of his affidavit. PRDSMF ¶ 53. This is a frivolous objection. Nurse Hunter is discussing what as a nurse, he found when he examined Ms. Wood on February 25, 2018, which is obviously based on his own personal knowledge. Ms. Wood also objects to the medical record of her February 25, 2018 nursing visit with Nurse Hunter as not properly authenticated. PRDSMF ¶ 53. Although it would have been preferable if Nurse Hunter had authenticated the medical record in his affidavit, the Court finds that the document is what the proponent claims it is and satisfies Federal Rule of Evidence 901(a). The Court overrules Ms. Wood's objection.

acetaminophen. DSMF ¶ 53; PRDSMF ¶ 53. Nurse Hunter also instructed Ms. Wood not to insert Q-tips or other foreign objects into her ears and to follow up at sick call if she did not experience improvement.[46] DSMF ¶ 54; PRDSMF ¶ 54. Due to Ms. Wood's swollen glands (cervical adenopathy), Nurse Hunter consulted a certified physician's assistant, Julie Zales, PA-C, who prescribed otic cortisporin, an antibiotic eardrop, to the affected ear.[47] DSMF ¶ 55; PRDSMF ¶ 55.

On February 26, 2018, Ms. Wood submitted an inmate medical request claiming that she required an extra mat or other padding for her bunk because she suffered from scoliosis. DSMF ¶ 56; PRDSMF ¶ 56. The medical provider responded on February 27, 2018 by asking Ms. Wood to provide the name and contact information for her medical provider and to sign a medical release allowing the PCJ medical provider to obtain her records. DSMF ¶ 56; PRDSMF ¶ 56.

On March 9, 2018, Ms. Wood was examined by Physician Assistant Julie Zales.[48] DSMF ¶ 57; PRDSMF ¶ 57. Ms. Wood told Physician Assistant Zales that she was prescribed Xanax for anxiety; that she had experienced ear discomfort as a result of putting Tampax in her ear; and that she suffered from scoliosis.[49] DSMF ¶ 57; PRDSMF ¶ 57. Ms. Wood did not report any other medical complaints to

[46] The Court overrules Ms. Wood's authentication objection. PRDSMF ¶ 54.

[47] The Court overrules Ms. Wood's authentication objection. PRDSMF ¶ 55.

[48] Ms. Wood objects to the remainder of DSMF paragraph 57, but the Court does not take her objection to reach the first sentence, which merely states that Physician Assistant Zale examined her on March 9, 2018.

[49] First, the Court corrects the reference to tampons in DSMF paragraph 57. The medical record states Tampax, a brand of tampon. Second, the Court reviewed the cited portion of Ms. Wood's deposition transcript, concludes that she did confirm the contents of her complaints in the medical record and overrules Ms. Wood's objection. PRDSMF ¶ 57.

Physician Assistant Zales or other medical staff at her March 9, 2018 examination.[50] DSMF ¶ 58; PRDSMF ¶ 58.

On March 16, 2018, Ms. Wood submitted an inmate medical request in which she reported that she had lost a piece of tampon in her left ear for a second time and was experiencing another earache as a result.[51] DSMF ¶ 59; PRDSMF ¶ 59. The medical provider instructed Ms. Wood to try extracting the tampon herself and, if she was unsuccessful, to resubmit her request, noting that "you were told not to put foreign objects in your ears." DSMF ¶ 59; PRDSMF ¶ 59. Ms. Wood resubmitted her request on March 18, 2018, stating that her attempts at removing the tampon herself were "very unsuccessful."[52] DSMF ¶ 60; PRDSMF ¶ 60. The medical provider removed the piece of tampon from Ms. Wood's ear on March 20, 2018 and noted that she was once again told to put nothing in her ears. DSMF ¶ 60; PRDSMF ¶ 60.

On March 25, 2018, Ms. Wood filed an inmate grievance form in which she stated that she had made several requests for a book to be brought to her from her property box yet had not received it.[53] DSMF ¶ 61; PRDSMF ¶ 61; DSMF ¶ 109;

---

50 The Court overrules Ms. Wood's authentication objection. PRDSMF ¶ 58.

51 The Court overrules Ms. Wood's authentication objection. PRDSMF ¶ 59.

52 The Court overrules Ms. Wood's authentication objection. PRDSMF ¶ 60. Ms. Wood questions the relevancy of PCJ's treatment of her ear issues, and the Court agrees the evidence is tangential. However, as Ms. Wood is asserting that PCJ failed to provide her adequate medical care, evidence that it properly attended to her ear issues is some evidence of due diligence. The Court overrules her relevancy objection.

53 Ms. Wood objects on hearsay and authentication grounds to DSMF paragraph 61. PRDSMF ¶ 61. The Court overrules her evidentiary objections. Ms. Wood also objects on relevancy grounds to her filing a grievance about a book. PRDSMF ¶ 61. The Court agrees that the issue of the book itself is not relevant; however, the fact she knew about the grievance process at PCJ is relevant to her later alleged failure to file grievances on the issues in this case. The Court overrules Ms. Wood's objection. Ms. Wood also objects to DSMF paragraph 109 on the grounds that the cited grievance was filed on her behalf by her cellmate instead of her personally. PRDSMF ¶ 109. The Court overrules this objection.

PRDSMF ¶ 109. Ms. Wood did not list any other complaints or issues on her March 25 grievance form.[54] DSMF ¶ 62; PRDSMF ¶ 62.

On March 29, 2018, Ms. Wood submitted an inmate medical request in which she reported that she was experiencing "nausea and upset stomach," and wrote that she "can't keep anything at all down . . . ." DSMF ¶ 63; PRDSMF ¶ 63. Ms. Wood was seen by Nurse Hunter at 8:45 a.m. the following morning, March 30, 2018.[55] DSMF ¶ 64; PRDSMF ¶ 64. Nurse Hunter examined Ms. Wood, including taking her orthostatic vital signs such as temperature, blood pressure, and heart rate. DSMF ¶ 64; PRDSMF ¶ 64. Nurse Hunter's March 30, 2018 examination of Ms. Wood revealed that she had indeterminate, somewhat conflicting signs; however, Nurse Hunter saw that Ms. Wood exhibited hand and foot tetany, or involuntary flexing of muscles, as well as signs and symptoms of hypovolemia, a state of low blood volume.[56] DSMF ¶ 65; PRDSMF ¶ 65. Nurse Hunter consulted with Julie Zales, the certified physician's assistant, who prescribed an anti-nausea medicine called Zofran to Ms.

---

[54] Ms. Wood objects to DSMF paragraph 62 on the ground that nothing in the grievance form suggests that an inmate must state every grievance on a single form. PRDSMF ¶ 62. The Court overrules Ms. Wood's objection. Ms. Wood otherwise admits DSMF paragraph 62.

[55] Ms. Wood objects to DSMF paragraph 64 on the grounds that Nurse Hunter's affidavit does not state the basis for his recollection and the medical record has not been authenticated. PRDSMF ¶ 64. The Court overrules the objection since Nurse Hunter's affidavit is sufficient to establish the fact and is consistent with the medical record which is what the proponent claims it is and satisfies Federal Rule of Evidence 901(a). Ms. Wood otherwise admits DSMF paragraph 64. PRDSMF ¶ 64.

[56] Ms. Wood objects to DSMF paragraph 65 on the ground that Nurse Hunter's affidavit does not state the basis for his recollection and the medical record has not been authenticated. PRDSMF ¶ 65. The Court overrules the objection since Nurse Hunter's affidavit is sufficient to establish the fact and is consistent with the medical record which is what the proponent claims it is and satisfies Federal Rule of Evidence 901(a). Although Ms. Wood objects to the reference to Dr. Kathleen Knipsher's deposition, the Court overrules this objection because, as framed, the statement is about Nurse Hunter's findings on examination, not Dr. Knipsher's history or opinions. Ms. Wood otherwise neither admits, denies or qualifies her response and therefore DSMF paragraph 65 is deemed admitted. *See* PRDSMF ¶ 65; D. ME. LOC. R. 56(g)(1) ("Facts in a supporting or opposing statement of material facts, if supported by record citations, will be deemed admitted unless properly controverted").

Wood for a period of two days and Powerade or other electrolytic drinks for a period of three days.[57] DSMF ¶ 66; PRDSMF ¶ 66. Physician Assistant Zales also ordered that a non-fasting comprehensive metabolic profile (CMP) be performed on Ms. Wood.[58] DSMF ¶ 67; PRDSMF ¶ 67. A CMP is a diagnostic test that checks a patient's electrolytes, kidney function, and liver function, among other things. DSMF ¶ 67; PRDSMF ¶ 67. According to Dr. Kathleen Knipscher, Ms. Wood's own medical expert, ordering a comprehensive medical profile was "very appropriate" under the circumstances. DSMF ¶ 68; PRDSMF ¶ 68. According to Dr. Knipscher, referring Ms. Wood to a PA was "an appropriate first step." DSMF ¶ 69; PRDSMF ¶ 69.

The following morning, March 31, 2018, Corrections Officer (CO) Beth Trimm conducted a "med pass" for female inmates in the N Block of the PCJ.[59] DSMF ¶ 70; PRDSMF ¶ 70. Ms. Wood felt too weak to come to the door, so CO Trimm asked the

[57] Ms. Wood objects to DSMF paragraph 66 on the ground that Nurse Hunter's affidavit does not state the basis for his recollection and the medical record has not been authenticated. PRDSMF ¶ 66. The Court overrules the objection since Nurse Hunter's affidavit is sufficient to establish the fact and is consistent with the medical record which is what the proponent claims it is and satisfies Federal Rule of Evidence 901(a). Ms. Wood otherwise neither admits, denies or qualifies her response and therefore DSMF paragraph 66 is deemed admitted. *See* PRDSMF ¶ 66; D. ME. LOC. R. 56(g)(1) ("Facts in a supporting or opposing statement of material facts, if supported by record citations, will be deemed admitted unless properly controverted").

[58] Ms. Wood objects to DSMF paragraph 67 on the ground that Nurse Hunter's affidavit does not state the basis for his recollection and the medical record has not been authenticated. PRDSMF ¶ 67. The Court overrules the objection since Nurse Hunter's affidavit is sufficient to establish the fact and is consistent with the medical record which is what the proponent claims it is and satisfies Federal Rule of Evidence 901(a). Ms. Wood otherwise neither admits, denies or qualifies her response and therefore DSMF paragraph 67 is deemed admitted. *See* PRDSMF ¶ 67; D. ME. LOC. R. 56(g)(1) ("Facts in a supporting or opposing statement of material facts, if supported by record citations, will be deemed admitted unless properly controverted").

[59] Ms. Wood objects to DSMF paragraph 70 on the ground that exhibit 30 is hearsay. PRDSMF ¶ 70. Exhibit 30, however, is obviously a record of a regularly conducted activity and is an exception to the hearsay rule under Federal Rule of Evidence 803(6). The Court overrules Ms. Wood's objection. Ms. Wood otherwise neither admits, denies or qualifies her response and therefore DSMF paragraph 70 is deemed admitted. *See* PRDSMF ¶ 70; D. ME. LOC. R. 56(g)(1) ("Facts in a supporting or opposing statement of material facts, if supported by record citations, will be deemed admitted unless properly controverted").

nurse on duty if she could bring Ms. Wood's medication to her. DSMF ¶ 70; PRDSMF ¶ 70. The nurse agreed, and CO Trimm handed Wood her medication along with a small cup of water. DSMF ¶ 70; PRDSMF ¶ 70. CO Trimm told Ms. Wood to take small sips of water, after which she instructed Ms. Wood to open her mouth so that CO Trimm could confirm that Ms. Wood had taken her medication.[60] DSMF ¶ 71; PRDSMF ¶ 71.

Shortly after noon on March 31, 2018, an unidentified inmate in the N Block of the PCJ pushed an emergency call button and informed CO Maxine Bruton that Ms. Wood "looked like she was going to seize out."[61] DSMF ¶ 72; PRDSMF ¶ 72. CO Bruton called other COs on her radio and told them to go check N Block. DSMF ¶ 72; PRDSMF ¶ 72. CO Trimm returned to N Block and found Ms. Wood being held upright by her roommate, Amanda Bushwood.[62] DSMF ¶ 73; PRDSMF ¶ 73. Ms.

---

60 Ms. Wood objects to DSMF paragraph 71 on the ground that exhibit 30 is hearsay. PRDSMF ¶ 70. Exhibit 30, however, is obviously a record of a regularly conducted activity and is an exception to the hearsay rule under Federal Rule of Evidence 803(6). The Court overrules Ms. Wood's objection. Ms. Wood otherwise neither admits, denies or qualifies her response and therefore DSMF paragraph 71 is deemed admitted. *See* PRDSMF ¶ 71; D. ME. LOC. R. 56(g)(1) ("Facts in a supporting or opposing statement of material facts, if supported by record citations, will be deemed admitted unless properly controverted").

61 Ms. Wood objects to DSMF paragraph 72 on the ground that exhibit 31 is hearsay. PRDSMF ¶ 72. Exhibit 31, however, is obviously a record of a regularly conducted activity and is an exception to the hearsay rule under Federal Rule of Evidence 803(6). The Court overrules Ms. Wood's objection. Ms. Wood otherwise neither admits, denies or qualifies her response and therefore DSMF paragraph 72 is deemed admitted. *See* PRDSMF ¶ 72; D. ME. LOC. R. 56(g)(1) ("Facts in a supporting or opposing statement of material facts, if supported by record citations, will be deemed admitted unless properly controverted").

62 Ms. Wood objects to DSMF paragraph 73 on the ground that exhibit 31 is hearsay. PRDSMF ¶ 73. Exhibit 31, however, is obviously a record of a regularly conducted activity and is an exception to the hearsay rule under Federal Rule of Evidence 803(6). The Court overrules Ms. Wood's objection. Ms. Wood otherwise neither admits, denies or qualifies her response and therefore DSMF paragraph 73 is deemed admitted. *See* PRDSMF ¶ 73; D. ME. LOC. R. 56(g)(1) ("Facts in a supporting or opposing statement of material facts, if supported by record citations, will be deemed admitted unless properly controverted").

Wood was pale, her breathing was labored, and she appeared to have a bluish color around her mouth. DSMF ¶ 73; PRDSMF ¶ 73.

Although CO Trimm was unsure whether this was a medical emergency, she nevertheless called the medical provider and the Shift Supervisor, CO Eric Tripp, who arrived shortly thereafter and checked Ms. Wood's pulse, which was weak.[63] DSMF ¶ 74; PRDSMF ¶ 74. A nurse from the Jail medical clinic came to Ms. Wood's room after CO Tripp and requested an ambulance for Ms. Wood.[64] DSMF ¶ 75; PRDSMF ¶ 75. Bangor Fire & Rescue arrived at the PCJ shortly thereafter and transported Ms. Wood to the hospital. DSMF ¶ 75; PRDSMF ¶ 75.

When she arrived at Eastern Maine Medical Center (EMMC) on March 31, 2018, Ms. Wood was diagnosed with rhabdomyolysis and related complications. DSMF ¶ 76; PRDSMF ¶ 76. Rhabdomyolysis is a breakdown of muscle tissue that gets released into the bloodstream and can cause severe kidney injury. DSMF ¶ 77; PRDSMF ¶ 77. Although it is a "serious" condition, rhabdomyolysis is also a "relatively common" condition and can have many causes. DSMF ¶ 78; PRDSMF

---

[63] Ms. Wood objects to DSMF paragraph 74 on the ground that exhibits 30 and 32 are hearsay. PRDSMF ¶ 74. Exhibits 30 and 32, however, are obviously records of a regularly conducted activity and are an exception to the hearsay rule under Federal Rule of Evidence 803(6). The Court overrules Ms. Wood's objection. Ms. Wood otherwise neither admits, denies or qualifies her response and therefore DSMF paragraph 74 is deemed admitted. *See* PRDSMF ¶ 74; D. ME. LOC. R. 56(g)(1) ("Facts in a supporting or opposing statement of material facts, if supported by record citations, will be deemed admitted unless properly controverted").

[64] Ms. Wood objects to DSMF paragraph 75 on the ground that exhibit 32 is hearsay. PRDSMF ¶ 75. Exhibit 32, however, is obviously a record of a regularly conducted activity and is an exception to the hearsay rule under Federal Rule of Evidence 803(6). The Court overrules Ms. Wood's objection. Ms. Wood otherwise neither admits, denies or qualifies her response and therefore DSMF paragraph 75 is deemed admitted. *See* PRDSMF ¶ 75; D. ME. LOC. R. 56(g)(1) ("Facts in a supporting or opposing statement of material facts, if supported by record citations, will be deemed admitted unless properly controverted").

¶ 78. The exact cause of Ms. Wood's rhabdomyolysis was uncertain. DSMF ¶ 79; PRDSMF ¶ 79.

One of Ms. Wood's designated medical experts is Dr. Allison Keith. DSMF ¶ 80; PRDSMF ¶ 80. Dr. Keith treated Ms. Wood at EMMC in March and April 2018. DSMF ¶ 80; PRDSMF ¶ 80. However, Dr. Keith has no independent memory of treating Ms. Wood, no knowledge or recollection of the treatment that Ms. Wood received or did not receive at the PCJ in March 2018, and no basis for forming an opinion about the medical care that Ms. Wood received at the PCJ. DSMF ¶ 80; PRDSMF ¶ 80.

Another of Ms. Wood's designated medical experts is Dr. Raymond Baxter. DSMF ¶ 81; PRDSMF ¶ 81. Dr. Baxter treated Ms. Wood at EMMC in March and April 2018. DSMF ¶ 81; PRDSMF ¶ 81. However, Dr. Baxter has no independent memory of treating Ms. Wood; no knowledge or recollection of the treatment that Ms. Wood received or did not receive at the PCJ in March 2018; and no basis for forming an opinion about the medical care that Ms. Wood received at the PCJ. DSMF ¶ 81; PRDSMF ¶ 81. When asked whether Ms. Wood's condition suggested that she had suffered from rhabdomyolysis "for some amount of time," Dr. Baxter stated that he could not answer the question, that he would not "speculate of the time course," and that he "wouldn't say that definitively." DSMF ¶ 82; PRDSMF ¶ 82. If Ms. Wood had suffered from vomiting, diarrhea, and dark urine for several days prior to being taken

to EMMC, it would not necessarily have indicated a medical emergency given that she was young and healthy.[65] DSMF ¶ 83; PRDSMF ¶ 83.

Another of Ms. Wood's medical experts is Dr. Kathleen Knipscher. DSMF ¶ 84; PRDSMF ¶ 84. Dr. Knipscher treated Ms. Wood at EMMC in March and April 2018. DSMF ¶ 84; PRDSMF ¶ 84. However, Dr. Knipscher has no independent memory of treating Wood; no knowledge or recollection of the treatment that she received or did not receive at the PCJ in March 2018; and no basis for forming an opinion about the medical care that she received at the PCJ. DSMF ¶ 84; PRDSMF ¶ 84.

Another of Ms. Wood's medical experts is Dr. Jared Kasper. DSMF ¶ 85; PRDSMF ¶ 85. Dr. Kasper treated Ms. Wood at EMMC in April 2018. DSMF ¶ 85; PRDSMF ¶ 85. However, Dr. Kasper has no independent memory of treating Ms. Wood; no knowledge or recollection of the treatment that she received or did not receive at the PCJ in March 2018; and no basis for forming an opinion about the medical care that she received at the PCJ. DSMF ¶ 85; PRDSMF ¶ 85.

Another of Ms. Wood's medical experts is Dr. Sophie Todd. DSMF ¶ 86; PRDSMF ¶ 86. Dr. Todd treated Ms. Wood at EMMC in March and April 2018. DSMF ¶ 86; PRDSMF ¶ 86. However, Dr. Todd has no independent memory of treating Ms. Wood. DSMF ¶ 86; PRDSMF ¶ 86. Dr. Todd has no knowledge or

---

[65] DSMF paragraph 83 originally stated: "If Ms. Wood had suffered from vomiting, diarrhea, and dark urine for several days prior to being taken to EMMC, it would not have indicated a medical emergency given that she was young and healthy." DSMF ¶ 83. Ms. Wood objected on the ground that DSMF paragraph 83 misstated Dr. Baxter's deposition testimony. PRDSMF ¶ 83. The Court reviewed Dr. Baxter's deposition testimony, *see* DSMF, Attach. 33, *Dep. of Raymond Baxter, M.D.* at 33:22-25 & 34:4-5, and agrees that DSMF paragraph 33 misstates Dr. Baxter's testimony. Dr. Baxter clearly stated that these symptoms would not necessarily have indicated a medical emergency. The Court has corrected DSMF paragraph 83 to accurately reflect the record.

recollection of the treatment that Ms. Wood received or did not receive at the PCJ in March 2018. DSMF ¶ 86; PRDSMF ¶ 86. She has no knowledge or recollection of any complaints that Ms. Wood made to jail personnel or to medical providers at the Jail. DSMF ¶ 86; PRDSMF ¶ 86. Dr. Todd has no basis for forming an opinion about the medical care that Ms. Wood received at the PCJ. DSMF ¶ 86; PRDSMF ¶ 86.

One day during her incarceration at PCJ, another inmate on N block, whose name Ms. Wood believes is Nickki Casseta, had a seizure and the inmates on N block called for help.[66] PSAMF ¶ 32; DRPSAMF ¶ 32. Nurse Bryan came about a minute and a half later, and Ms. Casseta was "coming out of it" but still seizing. PSAMF ¶ 32; DRPSAMF ¶ 32. Nurse Bryan told everyone to go to their cells, but Ms. Wood's cell was directly across from where Ms. Casseta was lying on the floor. PSAMF ¶ 32; DRPSAMF ¶ 32. She saw Nurse Bryan backhand Ms. Casseta twice really hard and then smack her really hard. PSAMF ¶ 32; DRPSAMF ¶ 32. Nurse Bryan yelled at Ms. Casseta, saying that she was faking it and he knew what a real seizure looked like, even though Ms. Casseta was on anti-seizure medicine and epileptic. PSAMF ¶ 32; DRPSAMF ¶ 32. When she came to, Ms. Casseta asked if she had hit her face on the table because it hurt so much, and the inmates told her that the jail nurse had hit her. PSAMF ¶ 32; DRPSAMF ¶ 32. Ms. Casseta had bruising and marks all over her face. PSAMF ¶ 32; DRPSAMF ¶ 32.

[66] The Defendants object to this statement and other statements in PSAMF paragraph 32 on the grounds that Ms. Wood's affidavit, which supports the statement, contradicts her deposition testimony. DRPSAMF ¶ 32. The Court overrules this objection and request to strike because the Court is required to view the record in the light most favorable to Ms. Wood. If there are contradictions in her testimony, the Court must view those contradictions in the light most favorable to her.

Nurse Bryan was the same nurse who accused Ms. Wood of faking her symptoms when she got sick before she was rushed to the hospital.[67] PSAMF ¶ 33; DRPSAMF ¶ 33. Nurse Bryan examined Ms. Wood after her roommate requested a medical request form on Ms. Wood's behalf, saying that Ms. Wood could not keep anything down. PSAMF ¶ 33; DRPSAMF ¶ 33. While examining Ms. Wood, Nurse Bryan observed her throw up on herself at least twice.[68] PSAMF ¶ 34; DRPSAMF ¶ 34. Nurse Bryan asked his assistant to get a potassium pill, and he then "got in [her] face" and aggressively told her that potassium is used for electrical activity for her heart. PSAMF ¶ 34; DRPSAMF ¶ 34. Nurse Bryan then asked her if she knew how the heart worked, and she replied that she did not know. PSAMF ¶ 34; DRPSAMF ¶ 34. Nurse Bryan then told her that without electrolytes and potassium, she would go into cardiac arrest and warned her that she was severely dehydrated because he could see that her hands and feet were curled involuntarily. PSAMF ¶ 34; DRPSAMF ¶ 34.

During this examination, Nurse Bryan could not uncurl Ms. Wood's hands and toes, and he told her that was due to electrolyte imbalances and she better stop being dramatic and stop making herself puke because if she did not keep the potassium pill down, she was not going to get another.[69] PSAMF ¶ 35; DRPSAMF ¶ 35. Ms. Wood

---

67 The Defendants interpose a qualified response to PSAMF paragraph 33 on the grounds that Ms. Wood never filed a grievance or other complaint about this incident. DRPSAMF ¶ 33. The Court declines to accept the Defendants' qualified response because it is nonresponsive.

68 The Defendants interpose a qualified response to PSAMF paragraph 34 on the grounds that Ms. Wood never filed a grievance or other complaint about this incident. DRPSAMF ¶ 34. The Court declines to accept the Defendants' qualified response because it is nonresponsive.

69 The Defendants interpose a qualified response to PSAMF paragraph 35 on the grounds that Ms. Wood never filed a grievance or other complaint about this incident. DRPSAMF ¶ 35. The Court declines to accept the Defendants' qualified response because it is nonresponsive.

was crying and telling Nurse Bryan that she was not faking it and did not know why she was sick. PSAMF ¶ 35; DRPSAMF ¶ 35. Nurse Bryan gave her the potassium pill and made her swallow it with water, but within two minutes, she had thrown it up. PSAMF ¶ 35; DRPSAMF ¶ 35. The nurse's assistant said, "don't you think we should find an alternative?"[70] PSAMF ¶ 36; DRPSAMF ¶ 36. Ms. Wood thought the nurse's assistant was referring to giving her the medication in a different form, such as an IV. PSAMF ¶ 36; DRPSAMF ¶ 36. Nurse Bryan made a joke about pregnant women breaking the budget and said that he was an army nurse and Ms. Wood needed to toughen up because this was not a real emergency. PSAMF ¶ 36; DRPSAMF ¶ 36. Ms. Wood tried to retrieve the pill from the vomit, but Nurse Bryan would not let her, despite her begging him to allow her to do so. PSAMF ¶ 36; DRPSAMF ¶ 36. Nurse Bryan told the nurse's assistant that Ms. Wood was not too keen on living, and he told her to send Ms. Wood back to her cell so she could think about her choices. PSAMF ¶ 36; DRPSAMF ¶ 36. Ms. Wood thought she was going to die and was very scared. PSAMF ¶ 36; DRPSAMF ¶ 36.

Ms. Wood was told to return to her cell.[71] PSAMF ¶ 37; DRPSAMF ¶ 37. She tried to get up and walk to her cell, but her feet were curled in and she could not walk.

---

[70] The Defendants object to this statement and other statements in PSAMF paragraph 36 and request to strike the paragraph on the ground that her affidavit, which supports the statement, contradicts her deposition testimony. DRPSAMF ¶ 36. The Court overrules this objection and request to strike because the Court is required to view the record in the light most favorable to Ms. Wood. If there are contradictions in her testimony, the Court must view those contradictions in the light most favorable to her.

[71] The Defendants object to this statement and other statements in PSAMF paragraph 37 and request to strike the paragraph on the ground that her affidavit, which supports the statement, contradicts her deposition testimony. DRPSAMF ¶ 37. The Court overrules this objection and request to strike because the Court is required to view the record in the light most favorable to Ms. Wood. If

PSAMF ¶ 37; DRPSAMF ¶ 37. The guard, Nurse Bryan, and the nurse's assistant failed to help her stand up, and she had to crawl thought her vomit and back to her cell. PSAMF ¶ 37; DRPSAMF ¶ 37. When she got to N block, the guard opened the door and watched her crawl inside. PSAMF ¶ 37; DRPSAMF ¶ 37. The whole time Ms. Wood was trying to make it back to her cell, she overheard the guards making jokes and saying that she was an actor and was being dramatic.[72] PSAMF ¶ 38; DRPSAMF ¶ 38. The guard shut the cell door behind her and nobody came to check on her or tell her how she could get the potassium. PSAMF ¶ 38; DRPSAMF ¶ 38. About twelve hours later, she was found unresponsive and in cardiac arrest. PSAMF ¶ 38; DRPSAMF ¶ 38. She later learned that it was at that point PCJ decided to call an ambulance for her. PSAMF ¶ 38; DRPSAMF ¶ 38.

Ms. Wood later reviewed Nurse Bryan's nursing records and she observed that on the nursing protocol for nausea/vomiting, he had circled, "no" for pain, when she was complaining of severe chest and abdominal pain.[73] PSAMF ¶ 39; DRPSAMF ¶ 39. She recalled that Nurse Bryan asked her on a scale of 1-10 what her pain was, and she told him that it was like a 9, and he replied that he had seen soldiers with

---

there are contradictions in her testimony, the Court must view those contradictions in the light most favorable to her.

[72] The Defendants object to this statement and other statements in PSAMF paragraph 38 and request to strike the paragraph on the ground that her affidavit, which supports the statement, contradicts her deposition testimony. DRPSAMF ¶ 38. The Court overrules this objection and request to strike because the Court is required to view the record in the light most favorable to Ms. Wood. If there are contradictions in her testimony, the Court must view those contradictions in the light most favorable to her.

[73] The Defendants object to this statement and other statements in PSAMF paragraph 39 on the ground that her affidavit, which supports the statement, contradicts her deposition testimony. DRPSAMF ¶ 39. The Court overrules this objection and request to strike because the Court is required to view the record in the light most favorable to Ms. Wood. If there are contradictions in her testimony, the Court must view those contradictions in the light most favorable to her.

battlefield wounds, and they don't even say 9, so she changed her answer to a 7 or 8. PSAMF ¶ 39; DRPSAMF ¶ 39. Nurse Bryan laughed and said, "I thought it was a 9. Which is it?" PSAMF ¶ 39; DRPSAMF ¶ 39. He then circled no pain at all. PSAMF ¶ 39; DRPSAMF ¶ 39. On the nausea/vomiting protocol, it states that if there is chest pain, the medical personnel should refer to the chest pain protocol, but Nurse Bryan failed to do so. PSAMF ¶ 39; DRPSAMF ¶ 39.

The medical protocol states that if "dehydration appears probable," or if there is "intractable vomiting" (and Ms. Wood satisfied both), then refer to med provider immediately.[74] PSAMF ¶ 40; DRPSAMF ¶ 40. The definition of intractable vomiting is vomiting that is persistent and difficult to control and leads to dehydration and weakness, and the treatment of this type of illness is fluids and strong antiemetics. PSAMF ¶ 40; DRPSAMF ¶ 40. Ms. Wood received neither. PSAMF ¶ 40; DRPSAMF ¶ 40. She heard Nurse Bryan say, "give her a liquid diet, and we'll refer her to provider in a few days." PSAMF ¶ 40; DRPSAMF ¶ 40.

### E. Brittany Wood's Allegations of Sexual Misconduct and Harassment

In general, during the entirety of her incarceration at the PCJ, Ms. Wood was exposed to a grossly sexualized environment.[75] PSAMF ¶ 2; DRPSAMF ¶ 2. From

[74] The Defendants object to this statement and other statements in PSAMF paragraph 40 on the ground that her affidavit, which supports the statement, contradicts her deposition testimony. DRPSAMF ¶ 40. The Court overrules this objection and request to strike because the Court is required to view the record in the light most favorable to Ms. Wood. If there are contradictions in her testimony, the Court must view those contradictions in the light most favorable to her. The Defendants also object on the ground that Ms. Wood is not a medical expert. DRPSAMF ¶ 40. Ms. Wood is not expressing medical opinions, however. She is merely reciting the language in the PCJ's own nursing protocols.

[75] The Defendants object to this statement and other statements in PSAMF paragraph 2 on the ground that Ms. Wood's affidavit, which supports the statement, contradicts her deposition testimony.

the beginning, she was exposed to daily instances involving corrections officers making sexual comments, innuendos, and deliberate and ultimately outright physical sexual acts perpetrated on inmates by PCJ guards. PSAMF ¶ 2; DRPSAMF ¶ 2; PSAMF ¶ 16; DRPSAMF ¶ 16.[76] Within around one week of being incarcerated, the guards began making sexually inappropriate comments directly to her, including statements about her breasts and other body features.[77] PSAMF ¶ 12; DRPSAMF ¶ 12. Around this time, she was warned by other women in her cellblock that nobody complains about sexual harassment because "it's bad for you to complain and nobody

DRPSAMF ¶ 2. The Court overrules this objection and request to strike because the Court is required to view the record in the light most favorable to Ms. Wood. If there are contradictions in her testimony, the Court must view those contradictions in the light most favorable to her.

The Defendants are correct that "where a party has given clear answers to unambiguous questions' in discovery, that party cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory,' unless there is a satisfactory explanation of why the testimony [has] changed." *Escribano-Reyes*, 817 F.3d at 386. But the Defendants only generally assert that there is a clear contradiction and have not provided the Court with citations to questions and answers that would generate the issue. The Court is not obligated to scour Ms. Wood's deposition transcript to prove or disprove the Defendants' argument.

[76] The Defendants interpose a qualified response to PSAMF paragraph 16 on the ground that Ms. Wood's affidavit, which supports the statement, does not allege that the purported sexual misconduct happened to her, nor how frequently she witnessed such misconduct, nor whether such misconduct was tolerated or investigated by the PCJ administration. DPRSAMF ¶ 16. The Court declines to accept the Defendants' qualified response because it is nonresponsive.

[77] The Defendants interpose a qualified response to PSAMF paragraph 12 and request to strike the statement on the ground that the statement contradicts her prior deposition testimony. DRPSAMF ¶ 12. The Court overrules the Defendants' objection and declines the request to strike, because the contents of PSAMF paragraph 12 do not clearly contradict her prior testimony and to implicate *Escribano-Reyes*, the prior testimony has to be a clear response to an unambiguous question. The fact that Ms. Wood testified that on one occasion a female corrections officer commented on her breasts does not mean that at other times, other corrections officers did not comment on her breasts and other body features.

cares."[78] PSAMF ¶ 13; DRPSAMF ¶ 13. A few weeks into her incarceration, guards began directly propositioning her.[79] PSFAMF ¶ 18; DRPSAMF ¶ 18.

Ms. Wood alleges that on multiple occasions at night, an unidentified male corrections officer would "feel up my whole body kind of slowly, like touching me . . . it just felt like he was copping a feel." DSMF ¶ 87; PRDSMF ¶ 87. The officer would touch and squeeze every inch of her body from head to toe, including her breasts and other sensitive body parts.[80] PSAMF ¶ 19; DRPSAMF ¶ 19. The first time it happened, she woke up halfway through and stayed still as he continued to feel her. PSAMF ¶ 19; DRPSAMF ¶ 19. The third time it happened, he massaged her for a while and she continued to fake sleep throughout the whole thing, and the corrections officer left gum under her pillow, like a thank you.[81] PSAMF ¶ 20; DRPSAMF ¶ 20. Ms. Wood knew this corrections officer's name during her incarceration in 2018 but can no longer remember it. DSMF ¶ 88; PRDSMF ¶ 88. Ms. Wood did not make a

---

[78] The Defendants interpose a qualified response to PSAMF paragraph 13 and request to strike the statement on the ground that the statement contradicts her prior deposition testimony. DRPSAMF ¶ 13. The Court overrules the Defendants' objection and declines the request to strike, because the contents of PSAMF paragraph 13 do not clearly contradict her prior testimony and to implicate *Escribano-Reyes*, the prior testimony has to be a clear response to an unambiguous question. The fact that Ms. Wood failed to identify this specific statement in response to a general question about misconduct does not mean that her affidavit contradicted her prior testimony.

[79] The Defendants interpose a qualified response to PSAMF paragraph 18 on the ground that the statement does not allege physical sexual harassment nor that Ms. Wood engaged in a sexual act. DRPSAMF ¶ 18. The Court rejects the Defendants' qualified response because it is nonresponsive to the assertion.

[80] The Defendants interpose a qualified response to PSAMF paragraph 19, noting that she does not claim that she reported this misconduct or filed a grievance. DRPSAMF ¶ 19. The Court declines to accept the Defendants' qualification because it is nonresponsive.

[81] The Defendants interpose a qualified response to PSAMF paragraph 20, noting that she does not claim that she reported this misconduct or filed a grievance. DRPSAMF ¶ 20. The Court declines to accept the Defendants' qualification because it is nonresponsive.

report to the PCJ concerning these incidents during her incarceration.[82] DSMF ¶ 89; PRDSMF ¶ 89.

Ms. Wood alleges that an unidentified male corrections officer watched her while she was in the shower on one occasion.[83] DSMF ¶ 90; PRDSMF ¶ 90. Ms. Wood explained that on N block, where she was incarcerated, the inmates are not locked in their cells at night, and she had difficulty sleeping, so she would get up and take a shower in the middle of the night. PSAMF ¶ 28; DRPSAMF ¶ 28. She found that showering helped her sleep. PSAMF ¶ 28; DRPSAMF ¶ 28. One guard spied on her while she was showering. PSAMF ¶ 29; DRPSAMF ¶ 29. She turned around and the guard was standing there, and the shower curtain was open enough for him to watch her shower. PSAMF ¶ 29; DRPSAMF ¶ 29. She did not know how long he had been watching her. PSAMF ¶ 29; DRPSAMF ¶ 29. This guard overheard her telling other women that she was fat, and he later told her that she was crazy for thinking that.[84] PSAMF ¶ 30; DRPSAMF ¶ 30. The guard told her that she was sexy and looked

---

82 DSMF paragraph 89 reads: "Wood did not file a grievance or make any other report to the PCJ concerning these incidents at any time before or after her incarceration." DSMF ¶ 89. Ms. Wood interposes a qualified response to DSMF paragraph 89 on the ground that there is no process at PCJ for a non-inmate to file a grievance and in effect, this lawsuit is her post-incarceration grievance. PRDSMF ¶ 89. The Court has struck DSMF paragraph 89 because there would have been no reason for Ms. Wood to complain before her incarceration about conduct that had not yet occurred and there is no evidence of a mechanism for a discharged inmate to file a grievance. The Court has included Ms. Wood's admission that she did not file a grievance while she was incarcerated regarding sexual exploitation. PRDSMF ¶ 89.

83 Ms. Wood objects to DSMF paragraphs 90-92 on the ground that it misstates her deposition testimony. PRDSMF ¶¶ 90-92. The Court reviewed the cited testimony for DSMF paragraphs 90-92, and observes that, taken together, they closely track her deposition testimony that there was one instance when an unidentified corrections officer watched her shower, another when he observed her getting out of the shower, and a third when he watched her change in her cell. DSMF ¶¶ 90-92, Attach. 2, *Dep. of Brittany Wood* at 173:15-175:6 (*Wood Dep.*). The Court overrules Ms. Wood's objections and declines to accept her denials.

84 The Defendants interposed a qualified response and moved to strike PSAMF paragraph 30 on the ground that Ms. Wood did not mention these comments during her deposition. DRPSAMF ¶ 30. The Court declines to accept the Defendants' qualified response and to strike the paragraph.

amazing. PSAMF ¶ 30; DRPSAMF ¶ 30. The guard bit his knuckle and stared for another minute while she showered and then left. PSAMF ¶ 30; DRPSAMF ¶ 30. Ms. Wood caught the same guard watching her shower at least three times.[85] PSAMF ¶ 31; DRPSAMF ¶ 31. When she told her cellmates, they told her that this was normal, and if she complained, things would go bad for her.[86] PSAMF ¶ 31; DRPSAMF ¶ 31. She felt demeaned and objectified. PSAMF ¶ 31; DRPSAMF ¶ 31.

Ms. Wood also alleges that on a different occasion the same unidentified corrections officer "popped his head in" the room while she was exiting the shower and gesticulated to her to drop her towel.[87] DSMF ¶ 91; PRDSMF ¶ 91. Ms. Wood also alleges that on a different occasion the same unidentified corrections officer saw her while she was changing in her room after she had returned from the shower.[88]

---

[85] The Defendants object to this statement and other statements in PSAMF paragraph 31 on the ground that Ms. Wood's affidavit, which supports the statement, contradicts her deposition testimony. DRPSAMF ¶ 31. The Court overrules this objection and request to strike because the Court is required to view the record in the light most favorable to Ms. Wood. If there are contradictions in her testimony, the Court must view those contradictions in the light most favorable to her.

[86] The Defendants also interpose a qualified response and moved to strike PSAMF paragraph 31 on the grounds that Ms. Wood did not mention these comments during her deposition. DRPSAMF ¶ 31. The Court declines to accept the Defendants' qualified response and to strike the paragraph.

[87] Ms. Wood objects to DSMF paragraph 91 on the grounds that it misstates her testimony, as she clearly testified that it was not the same officer. PRDSMF ¶ 91. The Court reviewed the cited testimony for DSMF paragraph 91 and observes that the narrative heavily implies that the same guard was involved in all three instances of voyeurism she alleges during her showers. The Court also notes that Ms. Wood's cited testimony, *Wood Dep.* at 174:25, clearly stating that a different guard was involved is responsive to the preceding question "is this the same guard that you say touched you during cell checks or a different guard?" The Court does not find that Ms. Wood ever claimed that different guards were involved in the alleged incidents related to her showers and overrules Ms. Wood's objections.

[88] Ms. Wood objects to DSMF paragraph 92 on the grounds that it misstates her testimony, as she clearly testified that it was not the same officer. PRDSMF ¶ 92. The Court reviewed the cited testimony for DSMF paragraph 92 and observes that the narrative heavily implies that the same guard was involved in all three instances of voyeurism she alleges during her showers. The Court also notes that Ms. Wood's cited testimony, *Wood Dep.* at 174:25, clearly stating that a different guard was involved is responsive to the preceding question "is this the same guard that you say touched you during cell checks or a different guard?" The Court does not find that Ms. Wood ever claimed that different guards were involved in the alleged incidents related to her showers and overrules Ms. Wood's objections.

DSMF ¶ 92; PRDSMF ¶ 92. Ms. Wood did not file a grievance while incarcerated or make a report to the PCJ concerning these incidents after her incarceration.[89] DSMF ¶ 93; PRDSMF ¶ 93.

Ms. Wood also alleges that a male corrections officer offered her an ice cream sandwich if she would perform oral sex on him while she was incarcerated. DSMF ¶ 94; PRDSMF ¶ 94; PSAMF ¶ 18; DRPSAMF ¶ 18.[90] Another woman had been engaging in sex in return for food, and the corrections officer and this woman spoke about their arrangement in front of Ms. Wood. PSAMF ¶ 18; DRPSAMF ¶ 18. There was no physical or sexual contact between the male corrections officer and Ms. Wood.[91] DSMF ¶ 95; PRDSMF ¶ 95. Ms. Wood did not file a grievance while incarcerated or make a report about this alleged incident to the PCJ after her incarceration.[92] DSMF ¶ 96; PRDSMF ¶ 96.

---

[89] DSMF paragraph 93 contains the odd phraseology found in DSMF paragraph 89, and the Court's ruling is the same. *See supra* n.85. The Court has included Ms. Wood's admission that she did not file a grievance about sexual exploitation while incarcerated. PRDSMF ¶ 93.

[90] The Defendants interpose a qualified response to PSAMF paragraph 18, noting that Ms. Wood's statement does not contain any allegation of physical sexual harassment, nor that Wood engaged in any sexual act. DRPSAMF ¶ 18. The Court declines to accept the Defendants' qualification because it is non-responsive.

[91] Ms. Wood objects to DSMF paragraph 95 on the ground that during her deposition, she did testify to physical sexual contact with a corrections officer. PRDSMF ¶ 95. Ms. Wood's objection contains a citation to her supplemental statement of material facts, but there is nothing specific cited. PRDSMF ¶ 95. The Court reviewed the portion of Ms. Wood's deposition the Defendants cited and agrees with the Defendants that Ms. Wood testified she did not comply with his request. *Wood Dep.* at 176:12-13 ("Obviously I didn't do it but that happened"). The Court overrules Ms. Wood's objection and declines to accept her denial.

[92] DSMF paragraph 96 contains the odd phraseology found in DSMF paragraph 89, and the Court's ruling is the same. *See supra* n.85. The Court has included Ms. Wood's admission that she did not file a grievance about her sexual exploitation while she was incarcerated. PRDSMF ¶ 96. Ms. Wood contends that she does not understand what "alleged incident" DSMF paragraph 96 concerns. PRDSMF ¶ 96. It is clear to the Court that DSMF paragraph 96 concerns the incident when a corrections officer offered to give her an ice cream sandwich if she would perform oral sex on him.

Ms. Wood also alleges that, after returning to the PCJ from a court appearance, an unidentified male corrections officer offered to take her to an area of the jail with no security cameras. DSMF ¶ 97; PRDSMF ¶ 97. Ms. Wood says that she "laughed it off" and that there was no physical or sexual contact between the male corrections officer and Ms. Wood. DSMF ¶ 98; PRDSMF ¶ 98. Ms. Wood did not file a grievance while incarcerated or make a report to PCJ about this incident after her incarceration.[93] DSMF ¶ 99; PRDSMF ¶ 99.

Ms. Wood recalls another event when she was being walked back to her cell from downstairs.[94] PSAMF ¶ 26; DRPSAMF ¶ 26. The guard escorting her told her that they could do anything in the elevator because there were no cameras and he also said that he knew all the places with no cameras so they would not be caught if she wanted to do him a favor. PSAMF ¶ 26; DRPSAMF ¶ 26. This same guard propositioned her on a hot summer day, when the air conditioner was not working, telling her and another inmate that he would give them an extra ice cream cookie sandwich if they "sucked his dick."[95] PSAMF ¶ 27; DRPSAMF ¶ 27.

---

[93] DSMF paragraph 99 contains the odd phraseology found in DSMF paragraph 89, and the Court's ruling is the same. *See supra* n.85. The Court has included Ms. Wood's admission that she did not file a grievance about her sexual exploitation while she was incarcerated. PRDSMF ¶ 99. Ms. Wood contends that she does not understand what "alleged incident" DSMF paragraph 99 concerns. PRDSMF ¶ 99. It is clear to the Court that DSMF paragraph 99 concerns the incident when a corrections officer offered to take her to an area of the jail without security cameras.

[94] The Defendants interpose a qualified response to PSAMF paragraph 26 on the ground that Ms. Wood alleges purely verbal, not physical harassment. DRPSAMF ¶ 26. The Court declines to accept the qualified response because it is nonresponsive to the paragraph.

[95] The Defendants interpose a qualified response to PSAMF paragraph 27 on the ground that Ms. Wood alleges purely verbal, not physical harassment. DRPSAMF ¶ 27. The Court declines to accept the qualified response because it is nonresponsive to the paragraph.

During her incarceration at PCJ, Ms. Wood personally witnessed numerous instances of sexual misconduct by jail guards and/or staff.[96] PSAMF ¶ 14; DRPSAMF ¶ 14. For example, Ms. Wood alleges that an unidentified male corrections officer engaged in a sexual encounter with another female inmate in a jail cell on Ms. Wood's cell block, and that both the female inmate and the corrections officer asked Ms. Wood to hold up a towel or t-shirt to obstruct the view into the cell.[97] DSMF ¶ 100; PRDSMF ¶ 100; PSAMF ¶ 14; DRPSAMF ¶ 14; PSAMF ¶ 15; DRPSAMF ¶ 15. Ms. Wood knew that the corrections officer and female inmate were having sex because she could clearly see both of them in a state of undress.[98] PSAMF ¶ 17; DRPSAMF ¶ 17. This was a semi-regular occurrence on her cellblock. PSAMF ¶ 17; DRPSAMF ¶ 17. There was no physical or sexual contact between that male corrections officer and Ms. Wood.[99] DSMF ¶ 101; PRDSMF ¶ 101. Ms. Wood did not file a grievance

---

96 The Defendants interpose a qualified response to PSAMF paragraph 14 on the ground that Ms. Wood alleges numerous instance of sexual misconduct yet only identifies one. DRPSAMF ¶ 14. The Court overrules the qualified response because the fact Ms. Wood identified one incident does not imply that more did not occur, especially given that Ms. Wood's qualifies that incident as an "example." PSAMF ¶ 14.

97 The Defendants interposed a qualified response to PSAMF paragraph 15 on the ground that the statement does not allege that Ms. Wood ever reported the alleged conduct to PCJ administration. DRPSAMF ¶ 15. The Court rejects the Defendants' qualified response as non-responsive.

98 The Defendants interpose a qualified response to PSAMF paragraph 17 and move to strike on the ground that she had previously identified only this incident and she never reported the incident to PCJ administration. DRPSAMF ¶ 17. The Court rejects the Defendants' qualified response. The fact that she identified one incident does not imply that more did not occur, and the Defendants' contention about the failure to report the incident is non-responsive.

99 Ms. Wood objects to DSMF paragraph 101 on the ground that it is vague as to which incident it is referring to. PRDSMF ¶ 101. The Court disagrees about her vagueness complaint and interprets DSMF paragraph 101 to be referring to the incident in which the male corrections officer and the female inmate asked her to hold up a towel for them.

while she was incarcerated or make any other report about this alleged incident after her incarceration.[100] DSMF ¶ 102; PRDSMF ¶ 102.

Ms. Wood also alleges that an unidentified female corrections officer made sexual comments to her while Ms. Wood was strip searched on two separate occasions. DSMF ¶ 103; PRDSMF ¶ 103.[101] Ms. Wood says that a female guard would strip search her whenever Ms. Wood returned from court or a visit.[102] PSAMF ¶ 21; DRPSAMF ¶ 21. She states that a particular female guard did the strip searches differently than the other guards, and Ms. Wood felt female corrections officer was inappropriate and violated her privacy. PSAMF ¶ 21; DRPSAMF ¶ 21. This corrections officer ordered her to spread the cheeks of her bottom multiple times, wider and wider, when the corrections officer was no more than six inches from her privates. PSAMF ¶ 21; DRPSAMF ¶ 21. This officer also had Ms. Wood cough, and she talked to Ms. Wood in a sexual way during the examination. PSAMF ¶ 21; DRPSAMF ¶ 21. Ms. Wood believes this female corrections officer was a lesbian.[103]

---

[100] DSMF paragraph 102 contains the odd phraseology found in DSMF paragraph 89, and the Court's ruling is the same. *See supra* n.85. The Court has included Ms. Wood's admission that she did not file a grievance about her sexual exploitation while she was incarcerated. PRDSMF ¶ 102.

[101] DSMF paragraph 104 states that "[t]here was no physical or sexual contact between the female corrections officer and [Ms.] Wood." DSMF ¶ 104. Ms. Wood objects based on her assertion that a strip search necessary entails physical contact and after the corrections officer made a sexual comment to her, she interpreted the later contact as sexual. PRDSMF ¶ 104. The Court sustains Ms. Wood's objection and has omitted DSMF paragraph 104.

[102] The Defendants interpose a qualified response to PSAMF paragraph 21, noting that she does not claim that she reported this misconduct or filed a grievance. DRPSAMF ¶ 21. The Court declines to accept the Defendants' qualification because it is nonresponsive.

[103] The Defendants interpose a qualified response to PSAMF paragraph 22 and move to strike the paragraph on the ground that Ms. Wood's understanding of the corrections officer's sexual preference is speculative. DRPSAMF ¶ 22. The Court rejects the Defendants' qualification in part and declines to strike the statement. A strip search conducted by person of the same sex of the person being searched is different if the officer is making sexual comments and the person being searched believes the officer is homosexual. The Court takes the Defendants' point that Ms. Wood cannot know whether the officer was a lesbian and therefore has altered the statement to say that Ms. Wood believed her to be a lesbian.

PSAMF ¶ 22; DRPSAMF ¶ 22. This corrections officer told Ms. Wood that she had nice breasts while she was performing the strip search, saying something along the lines of, "you had perfect tits." PSAMF ¶ 22; DRPSAMF ¶ 22. Ms. Wood felt violated. PSAMF ¶ 22; DRPSAMF ¶ 22. Even so, Ms. Wood believed that there was nothing she could do about the incident because the guards controlled everything and determined how difficult an inmate's time was going to be at PCJ, and, therefore, she did not file a grievance during her incarceration or make a report about this alleged incident after her incarceration.[104] DSMF ¶ 105; PRSAMF ¶ 105; PSAMF ¶ 22; DRPSAMF ¶ 22.

A guard named Buzzell used to hook up with a woman across the hallway. PSAMF ¶ 22; DRPSAMF ¶ 22.[105] The woman's last name was Stein, and Stein's roommate would usually hide by the door or window and tell them if anyone was coming. PSAMF ¶ 22; DRPSAMF ¶ 22. One time the guard asked Ms. Wood to stand guard. PSAMF ¶ 22; DRPSAMF ¶ 22. Ms. Wood asked them whether they were good/done yet. PSAMF ¶ 22; DRPSAMF ¶ 22. She observed that Ms. Stein was completely undressed, and the guard was tucking his shirt back in. PSAMF ¶ 22; DRPSAMF ¶ 22. CO Buzzell was the guard who passed out the jobs, and Ms. Wood

---

[104] DSMF paragraph 105 contains the odd phraseology found in DSMF paragraph 89, and the Court's ruling is the same. *See supra* n.85. The Court has included Ms. Wood's admission that she did not file a grievance about her sexual exploitation while she was incarcerated. PRDSMF ¶ 105.

[105] There are two paragraph twenty-twos in PSAMF. The Defendants interpose a qualified response and move to strike, stating that Ms. Wood failed to disclose this situation during her deposition. DRPSAMF ¶ 22. The Court declines to accept the Defendants' qualified response and to strike the statement.

was told by multiple cellmates that if an inmate wanted a job, she had to be nice to him.[106] PSAMF ¶ 23; DRPSAMF ¶ 23.

When Ms. Wood was at the EMMC and had no control over her body, releasing bodily fluids all over herself, one guard would stare and laugh while her legs were spread and she was getting wiped and cleaned up by the nurses.[107] PSAMF ¶ 24; DRPSAMF ¶ 24. One of the doctors asked this corrections officer to leave so that she could talk to Ms. Wood, and they argued back and forth.[108] PSAMF ¶ 25; DRPSAMF ¶ 25. Ms. Wood's doctor became upset about the way this officer was treating Ms. Wood. PSAMF ¶ 25; DRPSAMF ¶ 25. The doctor told Ms. Wood that she would not send her back to PCJ because of the condition she had arrived at the hospital in and because of the way PCJ was treating her. PSAMF ¶ 25; DRPSAMF ¶ 25. One guard assigned to monitor Ms. Wood in the hospital went out of his way to humiliate her. PSAMF ¶ 25; DRPSAMF ¶ 25. When she walked to the bathroom, she was naked under a hospital front gown. PSAMF ¶ 25; DRPSAMF ¶ 25. This guard would stare at her while the others would look away. PSAMF ¶ 25; DRPSAMF ¶ 25.

Ms. Wood cannot identify any of the corrections officers whom she claims harassed or assaulted her.[109] DSMF ¶ 106; PRDSMF ¶ 106. Wood claims that she

---

[106] The Defendants interpose a qualified response and move to strike, stating that Ms. Wood failed to disclose this situation during her deposition. DRPSAMF ¶ 23. The Court declines to accept the Defendants' qualified response and to strike the statement.

[107] The Defendants interpose a qualified response and move to strike, stating that Ms. Wood failed to disclose this situation during her deposition. DRPSAMF ¶ 24. The Court declines to accept the Defendants' qualified response and to strike the statement.

[108] The Defendants interpose a qualified response and move to strike, stating that Ms. Wood failed to disclose this situation during her deposition. DRPSAMF ¶ 25. The Court declines to accept the Defendants' qualified response and to strike the statement.

[109] Ms. Wood interposes a qualified response to DSMF paragraph 106, asserting that she tried to describe the corrections officers during her deposition. PRDSMF ¶ 106. The Court declines to accept

received "constant generic comments" and that she thought of jail as "just a place where you get harassed by guards" who "get to creep on you and you can't do anything about it." DSMF ¶ 107; PRDSMF ¶ 107. Ms. Wood did not file a grievance concerning purported sexual harassment or assault during the entire time that she was incarcerated or after she left the PCJ.[110] DSMF ¶ 108; PRDSMF ¶ 108. Ms. Wood first recounted her claims at her deposition in the instant litigation. DSMF ¶ 108; PRDSMF ¶ 108. When asked if she could recall any other specific events that she alleged as sexual harassment, Ms. Wood answered that she could not think of any other incidents right then.[111] DSMF ¶ 110; PRDSMF ¶ 110. Ms. Wood alleges that she was sexually harassed by "four or less" corrections officers at the PCJ: one female and three males.[112] DSMF ¶ 111; PRDSMF ¶ 111. Except to say that these incidents occurred during her 2018 incarceration, Ms. Wood is unable to specify any timeframe on when her allegations of sexual assault and sexual harassment occurred.[113] DSMF ¶ 112; PRDSMF ¶ 112. During her May incarceration in 2018, Ms. Wood received

her qualified response because the fact she tried to identify the corrections officers does not negate the fact she could not.

110 DSMF paragraph 108 does not contain the odd phraseology of the earlier statements about whether she filed a grievance while she was incarcerated.

111 DSMF paragraph 110 states: "When asked if she could recall any other specific events that she alleged as sexual harassment, Ms. Wood answered that she could not." Ms. Wood interposed a qualified response, indicating that she answered she could not think of any other incidents at the time. PRDSMF ¶ 110. The Court amended DSMF paragraph 110 to more accurately reflect her deposition testimony. *See Wood Dep.* at 183:15-19.

112 Ms. Wood interposes a qualified response, noting that she witnessed other instances when corrections officers engaged in sexual misconduct with other female inmates. PRDSMF ¶ 111. The Court declines to accept this qualification because it is not responsive to DSMF paragraph 111.

113 DSMF paragraph 112 originally stated "Ms. Wood is unable to specify any timeframe on when her allegations of sexual assault and sexual harassment occurred." Ms. Wood interposed the obvious qualification that she has alleged that these incidents took place while she was incarcerated in 2018. PRDSMF ¶ 112. The Court agrees with Ms. Wood and has amended DSMF paragraph 112 accordingly.

written information regarding how to report allegations of sexual misconduct and signed an acknowledgment form indicating that she had received it.[114] DSMF ¶ 113; PRDSMF ¶ 113.

The County produced a written report and audio of an interview conducted by Sgt. Robert L. Jordan.[115] PSAMF ¶ 41; DRPSAMF ¶ 41. In the report and audio, Sgt. Jordan indicated that he was reporting the same allegations that Ms. Wood has made in this lawsuit about the rampant sexualized culture at PCJ. PSAMF ¶ 41; DRPSAMF ¶ 41. In her view, the Jordan report corroborates her allegations in this lawsuit. PSAMF ¶ 43; DRPSAMF ¶ 43.

### F. Penobscot County Sheriff's Office's Investigation of Alleged Sexual Misconduct

In 2018, the Penobscot County Sheriff's Office (PCSO) received a report containing an allegation that a corrections officer at the PCJ was receiving sexual favors from female inmates in return for passing information and other items between inmates at the Jail. DSMF ¶ 114; PRDSMF ¶ 114. Then Chief Deputy William Birch of the PCSO assigned Detective Sgt. John Trask to investigate the

---

[114] Ms. Wood interposed a qualified response and objected to DSMF paragraph 113. PRDSMF ¶ 113. As the acknowledgement form was signed on May 23, 2018, it is clear that she signed the acknowledgement form during her last 2018 PCJ incarceration, and the Court has amended DSMF paragraph 113 to reflect the date on her acknowledgement form.

[115] The Defendants object to PSAMF paragraph 41 on the ground that it contains information that is subject to Rule 56(d), and as Ms. Wood did not move for consideration of the Jordan report under Rule 56(d), she has waived the right to refer to it. DRPSAMF ¶ 41. In its discretion, for purposes of the motion for summary judgment only, the Court overrules the Defendants' objection. Ms. Wood objects in PSAMF paragraphs 42-44 to the Defendants' late disclosure of the report. PSAMF ¶¶ 42-44. The Court has not engaged in this discovery dispute but has included her allegations about the Jordan report for purposes of this dispositive motion.

allegation.[116] DSMF ¶ 115; PRDSMF ¶ 115. Detective Sgt. Trask interviewed five female inmates as part of his investigation. DSMF ¶ 115; PRDSMF ¶ 115. Brittany Wood was one of the inmates who was interviewed. DSMF ¶ 116; PRDSMF ¶ 116; PSAMF ¶ 3; DRPSAMF ¶ 3. None of the female inmates, including Brittany Wood, who were interviewed substantiated the claims that corrections officers were engaging in sexual contact with inmates.[117] DSMF ¶ 117; PRDSMF ¶ 117.

One inmate, Rose Horan, claimed that a corrections officer had walked in on Brittany Wood while she was undressed in her room. DSMF ¶ 118; PRDSMF ¶ 118. Ms. Wood denied that any corrections officer had ever walked in on her at the PCJ while she was undressed; thus Ms. Horan's allegation could not be substantiated.[118] DSMF ¶ 119; PRDSMF ¶ 119. When Detective Sgt. Trask informed Ms. Wood that someone told him that a corrections officer was standing at the door to her cell watching her get dressed, Ms. Wood replied to Sgt. Trask that "that's ridiculous," and "well, that didn't happen."[119] DSMF ¶ 120; PRDSMF ¶ 120. Ms. Wood denied that a corrections officer had ever told her that "it's not like I haven't seen tits before" after

[116] Ms. Wood objects on the ground that John Trask's affidavit does not indicate whether the statement is based on his personal knowledge. PRDSMF ¶ 115. The Court overrules Ms. Wood's objection.

[117] Ms. Wood objects on the ground that John Trask's affidavit does not indicate whether the statement is based on his personal knowledge. PRDSMF ¶ 117. The Court overrules Ms. Wood's objection.

[118] Ms. Wood objects on the ground that John Trask's affidavit does not indicate whether the statement is based on his personal knowledge. PRDSMF ¶ 119. The Court overrules Ms. Wood's objection.

[119] Ms. Wood objects on the ground that John Trask's affidavit does not indicate whether the statement is based on his personal knowledge. PRDSMF ¶ 120. The Court overrules Ms. Wood's objection.

she got out of the shower with only a towel covering her.[120] DSMF ¶ 121; PRDSMF ¶ 121. Ms. Wood stated to Sgt. Trask, "that never happened to me, ever," and "I don't know why anyone would ever say that." DSMF ¶ 121; PRDSMF ¶ 121. Ms. Wood did not allege to Detective Sgt. Trask that a corrections officer had watched her in the shower.[121] DSMF ¶ 122; PRDSMF ¶ 122. Ms. Wood did not allege to Sgt. Trask that a corrections officer had touched her while she was lying in her bunk at night.[122] DSMF ¶ 123; PRDSMF ¶ 123. Ms. Wood made no allegations to Sgt. Trask concerning incidents of sexual misconduct against her or another inmate by a corrections officer at the PCJ.[123] DSMF ¶ 124; PRDSMF ¶ 124. When Sgt. Trask assured Ms. Wood that his primary objective in investigating these allegations was the safety of inmates at the PCJ, Ms. Wood replied, "I hear you. I would have said something."[124] DSMF ¶ 125; PRDSMF ¶ 125. Sgt. Trask was unaware of any complaints during Ms. Wood's 2018 incarceration at PCJ that were substantiated.[125] DSMF ¶ 126; PRDSMF ¶ 126.

---

[120] Ms. Wood objects on the ground that John Trask's affidavit does not indicate whether the statement is based on his personal knowledge. PRDSMF ¶ 121. The Court overrules Ms. Wood's objection.

[121] Ms. Wood objects on the ground that John Trask's affidavit does not indicate whether the statement is based on his personal knowledge. PRDSMF ¶ 122. The Court overrules Ms. Wood's objection.

[122] Ms. Wood objects on the ground that John Trask's affidavit does not indicate whether the statement is based on his personal knowledge. PRDSMF ¶ 123. The Court overrules Ms. Wood's objection.

[123] Ms. Wood objects on the ground that John Trask's affidavit does not indicate whether the statement is based on his personal knowledge. PRDSMF ¶ 124. The Court overrules Ms. Wood's objection.

[124] Ms. Wood objects on the ground that John Trask's affidavit does not indicate whether the statement is based on his personal knowledge. PRDSMF ¶ 125. The Court overrules Ms. Wood's objection.

[125] DSMF paragraph 126 originally stated: "The allegation which Trask investigated was the only allegation brought to the PCSO or the PCJ Administration's attention during [Ms.] Wood's 2018 incarceration. Ms. Wood objected on the ground that Sgt. Trask's testimony addressed only

Ms. Wood acknowledges that she denied having witnessed or having been the victim of sexual misconduct when questioned by Sgt. Trask, but she explains that she had previously been warned by guards and cellmates that such allegations resulted in retaliation and she was still incarcerated at Washington County Jail at the time.[126] PSAMF ¶¶ 3-4; DRPSAMF ¶¶ 3-4. When she denied being aware of sexual misconduct perpetrated by the guards at PCJ, Sgt. Trask told her, "It happens all the time."[127] PSAMF ¶ 5; DRPSAMF ¶ 5. Within a week or two of being incarcerated, Ms. Wood was warned by cellmates (more than once) that inmates who report against guards—especially for issues related to sexual misconduct—face harsh retribution.[128] PSAMF ¶ 6; DRPSAMF ¶ 6. After she had been incarcerated at PCJ for about two weeks, she questioned a guard about why one of her cellmates seemed to receive preferential treatment in work assignments, despite her behavior issues.[129] PSAMF ¶ 7; DRPSAMF ¶ 7. The guard told me that the cellmate "plays ball" and then made a sexual reference, though he did not specify what exactly she did or whom she did it with, other than it was with a guard. PSAMF ¶ 7; DRPSAMF ¶ 7.

substantiated allegations. PRDSMF ¶ 126. The Court reviewed Sgt. Trask's deposition transcript and has altered DSMF ¶ 126 to more precisely track Sgt. Trask's testimony.

[126] The Defendants qualified their responses to PSAMF paragraphs 3 and 4. DRPSAMF ¶¶ 3-4. The Court acknowledges and incorporates Defendants' qualification that Ms. Wood was incarcerated in Washington County Jail at the time of her interview with Detective Trask, not at the PCJ, and otherwise overrules the Defendants' qualifications.

[127] The Defendants qualified their responses to PSAMF paragraph 5 and moved to strike. DRPSAMF ¶ 5. The Court has reviewed the portions of the deposition transcript the Defendant's reference, as well as the preceding segment, and determined that Ms. Wood did not deny speaking to a male officer. *Wood Dep.* at 131:14-132:24. The Court overrules the Defendants' qualifications and denies their motion to strike.

[128] The Defendants qualified their responses to PSAMF paragraph 6. DRPSAMF ¶ 6. The Court overrules the Defendants' qualification as unnecessary since it is otherwise established that Ms. Wood was not incarcerated at PCJ during the Trask interview.

[129] The Defendants qualified their responses to PSAMF paragraph 7 and moved to strike. DRPSAMF ¶ 7. The Court overrules the Defendants' qualifications and denies their motion to strike.

## IV. THE POSITIONS OF THE PARTIES

### A. The Defendants' Motion

#### 1. Medical Care

##### a. Statute of Limitations

The Defendants first argue that Ms. Wood's § 1983 claim of deliberate indifference to her medical care needs is time-barred. *Defs.' Mot.* at 16-17. They note that Ms. Wood left PCJ for the Eastern Maine Medical Center on March 31, 2018, and therefore argue that March 31, 2018 is the last date her deliberate indifference claim could have accrued. *Id.* at 17. Applying Maine's six-year statute of limitations under 14 M.R.S. § 752, the Defendants say that Ms. Wood's initial April 3, 2024 filing in state court was too late by three days. *Id.* Next, the Defendants maintain that the record evidence does not justify the conclusion that PCJ was deliberately indifferent to her medical needs. *Id.* at 17-19.

##### b. Municipal Liability

The Defendants next argue that there is no evidence that Penobscot County had an official policy of denying medical care to inmates at PCJ and the evidence is to the contrary. *Id.* at 19-20.

##### c. Supervisory Liability

Finally, the Defendants contend that there is no evidence in the record that Sheriff Morton or other supervisors at the PCJ had actual or constructive knowledge of a grave risk of harm to Ms. Wood stemming from a failure to provide emergency or non-emergency medical care to inmates at the PCJ, nor any evidence that the Jail

administration failed to take measures to address such a risk or otherwise disregarded a known or obvious risk. *Id* at 20.

**2. Sexual Misconduct Claims**

**a. Absence of Physical Contact**

Citing caselaw, the Defendants first assert that Ms. Wood cannot prevail on a § 1983 claim for verbal harassment unaccompanied by physical contact. *Id.* at 21.

**b. Municipal Liability**

The Defendants next argue that there is no evidence that Penobscot County had an official policy or widespread custom or practice of permitting or tolerating sexual misconduct against inmates at PCJ and the evidence is to the contrary. *Id.* at 21-23.

**c. Supervisory Liability**

Finally, noting that Ms. Wood has admitted that she never filed an inmate grievance, the Defendants contend that there is no evidence in the record that Sheriff Morton or other supervisors at the PCJ had actual or constructive knowledge of a grave risk of harm to Ms. Wood and other inmates from sexual harassment. *Id.* at 23-24. Thus, there is no evidence in the record from which a jury could reasonably conclude that Sheriff Morton was deliberately indifferent or willfully blind to alleged abuse.

**B. Brittany Wood's Opposition**

**1. Medical Care**

**a. Statute of Limitations**

Ms. Wood did not respond to the Defendants' statute of limitations issue. *Pl.'s Opp'n* at 1-8.

#### b. Municipal Liability

Although Ms. Wood posits facts about her medical care at PCJ in her opposition, she does not respond to the official policy issue. *Id.* at 8.

#### c. Supervisory Liability

Similarly on the supervisory liability issue, although Ms. Wood posits facts about her medical care in her opposition, she does not respond to the official policy issue. *Id.* at 8.

### 2. Sexual Harassment

#### a. Absence of Physical Contact

Ms. Wood points out that she has alleged that one corrections officer came into her cell and fondled her while she feigned sleep. *Id.* at 3. She says the officer would run his hands over her body, over the covers, feeling her breasts and crotch. *Id.* She also cites a Sixth Circuit case in which the appeals court held that physical touching may not be necessary to state a violation of the Eighth Amendment. *Id.* at 5.

#### b. Municipal Liability

Ms. Wood posits facts about the prevalence of sexual harassment she and other female inmates endured, but she does not directly address the legal standard for the imposition of municipal liability. *Id.* at 2-3.

#### c. Supervisory Liability

Ms. Wood posits facts about the prevalence of sexual harassment she and other female inmates endured, but she does not directly address the legal standard for the imposition of municipal liability. *Id.* at 2-3. Ms. Wood also points to Sergeant John Trask's admission, referring to sexual harassment, that "it happens in there – a lot." *Id.* at 2.

### C. The Defendants' Reply

#### 1. Medical Care

##### a. Statute of Limitations

The Defendants observe that Ms. Wood did not dispute that she left PCJ on March 31, 2018 and did not return. *Defs.' Reply* at 2-3. They say she should be held to have waived the issue. *Id.*

##### b. Municipal and Supervisory Liability

The Defendants also argue that Ms. Wood's response to their municipal and supervisory liability issues was so inadequate that she should be held to have waived the issue. *Id.* at 3-4.

#### 2. Sexual Misconduct

##### a. Inadequate Record Citations

The Defendants first maintain that Ms. Wood has failed to comply with the citation requirements of the District's Local Rules and thus her response should be disregarded. *Id.* at 4.

##### b. Verbal Sexual Harassment

The Defendants argue that Ms. Wood failed to rebut their contention that to maintain a sexual harassment claim requires something more than verbal harassment. *Id.* at 4-5.

**c. Technical Issues**

The Defendants raise several technical issues about the Trask affidavit, the Jordan Report, and her own affidavit. *Id.* at 5-12.

## V. LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc., v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

When the movant "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must provide "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d

1113, 1116 (1st Cir. 1993)). Then, a "court views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011) (citation omitted), disregarding "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)). "[T]he plain language of Rule 56(c) mandates entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## VI. DISCUSSION

### A. Pro Se Leniency

In *Haines v. Kerner*, 404 U.S. 519 (1972), addressing a motion to dismiss, the United States Supreme Court wrote that a pro se complaint "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 520-21 (citing *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). In *Ahmed v. Rosenblatt*, 118 F.3d 886 (1st Cir. 1997), the First Circuit observed that "[o]ur judicial system zealously guards the attempts of pro se litigants on their own behalf." *Id.* at 890.

The Defendants argue that Ms. Wood is not entitled to this leniency because her former Attorney David Walker acknowledged spending hours on her response to the defendant's statement of material fact. *Defs.' Reply* at 1-2. The Defendants cite authority that a pro se litigant is not entitled to leniency "once a former party retains counsel and counsel reviews the pleadings." *Id.* (citing *Abernathy v. Dewey*, 277 F. Supp. 3d 129, 137 (D. Mass 2017)).

The Court declines to accept the Defendants' argument against the rule of liberal construction. The Defendants filed their motion on December 11, 2025. *Defs.' Mot.* Ms. Wood's response, as extended, was due by January 20, 2026, *see Order* (ECF No. 79) and Attorney Walker failed to respond to it. To avoid what would amount to a default, the Court scheduled oral argument on March 3, 2026. *Not. of Hr'g* (ECF No. 81). Attorney Walker and Ms. Wood appeared at the hearing and Attorney Walker informed the Court that he intended to withdraw as Ms. Wood's counsel. The Court stayed the matter to allow Ms. Wood to obtain counsel, and on March 17, 2026, Attorney Walker moved to withdraw as her lawyer. *Mot for Leave of Ct. to Withdraw as Counsel* (ECF No. 84). On March 20, 2026, Attorney Walker's motion to withdraw was granted, and at that point, Ms. Wood represented herself. *Order* (ECF No. 87). After a further extension to April 3, 2026 to allow Ms. Wood to obtain counsel, *see Order* (ECF No. 88), she proceeded pro se. Ms. Wood filed her opposition to the Defendants' motion for summary judgment, her response to the Defendants' statement of facts, and her own statement of additional material facts all on April 6, 2026. *Pls.' Opp'n*; PRDSMF/PSAMF.

These circumstances are distinct from *Abernathy*. The plaintiff in *Abernathy* initially filed the complaint acting pro se; however, counsel entered an appearance on behalf of the plaintiff and moved twice to amend the complaint. 277 F. Supp. 3d at 136. The *Abernathy* case stands for the sensible proposition that once an attorney represents a pro se litigant, the litigant is no longer pro se and may not enjoy the leniency accorded to a pro se litigant. *Abernathy* simply does not speak to circumstances akin to this case, where an attorney represents a litigant for a time, then withdraws.

Here, Ms. Wood began the lawsuit on April 3, 2024 acting pro se. *Compl.* Attorney David Walker entered his appearance on behalf of Ms. Wood on September 16, 2025, then moved to withdraw his appearance on March 17, 2026. *Mot. for Leave of Ct. to Withdraw as Counsel* (ECF No. 84). Ms. Wood filed her response to the motion for summary judgment on April 6, 2026. *Pl.'s Mot.* Thus, when she filed her response, she was representing herself.

In addition, this Court does not know (and neither could the Defendants know) how much of Attorney Walker's work product is found in Ms. Wood's submissions. The test is in the submissions, and Ms. Wood's filing is clearly not the finished product of a lawyer. The Defendants themselves repeatedly argue that Ms. Wood's responses were so inadequate that she should be held to have waived argument and that she failed to cite record evidence to support her contentions. Based on the contents of Ms. Wood's filing, the Court does not find her submissions contain the indicia of attorney involvement that would justify declining to apply the pro se leniency rubric. In these

circumstances, the Court will treat Ms. Wood's filings with the leniency traditionally accorded pro se filers.

This leniency has limits. "While courts have historically loosened the reins for pro se parties, the right of self-representation is not a license not to comply with relevant rules of procedural and substantive law." *Eagle Eye Fishing Corp. v. U.S. Dep't of Com.*, 20 F.3d 503, 506 (1st Cir. 1994) (internal citations omitted).

### B. Medical Care

#### 1. Statute of Limitations

In their motion, the Defendants assert that Ms. Wood's medical care claim must fail because she filed the complaint beyond the applicable statute of limitations. *Defs.' Mot.* at 16-17. In *Wilson v. Garcia*, 471 U.S. 261 (1985), the Supreme Court ruled that district courts must "adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so." *Id.* at 266-67. In *Wilson*, the Supreme Court held that claims under § 1983 for violations of constitutional rights are best characterized as personal injury claims. *Id.* at 277-80. Following *Wilson*, in *Small v. Belfast*, 796 F.2d 544 (1st Cir. 1986), the First Circuit ruled that "the Maine six-year statute of limitations is the appropriate one to be used for § 1983 cases in Maine." *Id.* at 546.

The Defendants observe that Ms. Wood's cause of action under § 1983 accrued when she was injured, and they note that she left PCJ for the EMMC on March 31, 2018. *Defs.' Mot.* at 17. In their view, "March 31, 2018, is the latest date on which her deliberate indifference claim could have accrued, given that any alleged failure

to provide medical care at the PCJ must have occurred on or before this date." *Id.* As Ms. Wood did not file her complaint until April 3, 2024, she was, according to the Defendants, three days late under Maine's six-year statute of limitations. *Id.*

Ms. Wood did not respond to the Defendants' statute of limitations argument, but there is an obvious flaw in Defendants' argument. Under 14 M.R.S. § 853, Maine law excludes the time a person is imprisoned. As the statements of material fact reveal, on February 22, 2018, Ms. Wood was arrested again. DSMF ¶ 4; PRDSMF ¶ 4. Her bail was revoked, and she was incarcerated at the PCJ for approximately five weeks. DSMF ¶ 4; PRDSMF ¶ 4. Ms. Wood remained incarcerated at PCJ until March 31, 2018, when she was taken by ambulance to Eastern Maine Medical Center (EMMC). DSMF ¶ 5; PRDSMF ¶ 5. Ms. Wood was hospitalized at EMMC until April 13, 2018. DSMF ¶ 6; PRDSMF ¶ 6. Ms. Wood left EMMC on April 13, 2018 against medical advice after Sheriff Morton granted her a medical furlough from custody. DSMF ¶ 7; PRDSMF ¶ 7.

The First Circuit has observed that Maine's six-year statute of limitations "does not commence to run while complainant continues to be in prison." *Still v. Nichols*, 412 F.2d 778, 780 (1st Cir. 1969). Although the date of the Sheriff's furlough is not crystal clear, the best the Court can make it out Ms. Wood was still in custody while she was at the EMMC and was not released from custody until Sheriff Morton granted her a medical furlough.[130] As the period of her custody appears to have been

[130] The Defendants cite portions of Ms. Wood's deposition transcript in support of these statements. DSMF ¶ 7. The cited transcript does not expressly reveal when Sheriff Morton issued a medical furlough; however, Exhibit 3 attached to the Defendants' statement of material facts is Ms. Wood's "housing snapshot" at PCJ and reveals that her "release date" from the February 22, 2018

to April 13, 2018, the April 3, 2024 date for the filing of her complaint falls within the six-year statute of limitations.

### 2. Medical Care

#### a. Legal Standards

In 2023, the First Circuit engaged in a comprehensive description of the standards to be applied to an inmate's Eighth Amendment medical care claim.[131] *Sosa v. Massachusetts Dep't of Corr.*, 80 F.4th 15, 27-28 (1st Cir. 2023). The First Circuit wrote that under the "Eighth Amendment's prohibition on cruel and unusual punishment, prison officials 'must ensure that inmates receive adequate . . . medical care.'" *Id.* at 27 (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *see also Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (explaining that Eighth Amendment principles establish "the government's obligation to provide medical care for those whom it is punishing by incarceration"). The *Sosa* Court explained that the "inquiry into whether an inmate has been deprived of constitutionally adequate medical care has two components, one objective and one subjective." *Id.*

In *Sosa*, the First Circuit wrote that the "objective component requires that the medical needs of the inmate seeking care be 'sufficiently serious.'" *Id.* (quoting *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). A

---

arrest was April 13, 2018. It seems consistent with the other facts that Ms. Wood's self-discharge from the hospital coincided with the Sheriff's medical furlough.

[131] Because Ms. Wood was a pretrial detainee, her claim arises under the Fourteen Amendment to the United States Constitution. *Leavitt v. Corr. Med. Servs., Inc.*, 645 F.3d 484, 497 n.21 (1st Cir. 2011). However, the Fourteenth Amendment standard applicable to pre-trial detainees is the same as the Eighth Amendment standard that protects prisoners after conviction. *Id.* The adequacy of medical care is "measured against 'prudent professional standards.'" *Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 142 (1st Cir. 2014).

medical need is sufficiently serious if it "has been diagnosed by a physician as mandating treatment," or is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (quoting *Zingg v. Groblewski*, 907 F.3d 630, 635 (1st Cir. 2018) (quoting *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014)).

Subjectively, prison officials must possess a "sufficiently culpable state of mind" amounting to "deliberate indifference to the [inmate's] health or safety." *Id.* (quoting *Zingg*, 907 F.3d at 635) (citing *Perry v. Roy*. 782 F.3d 73, 78 (1st Cir. 2015)). To meet the deliberate indifference standard, prison officials must either deny "needed medical treatment in order to punish the inmate," or display "'wanton' or criminal recklessness in the treatment afforded." *Id.* (quoting *Watson v. Caton*, 984 F.2d 537, 540 (1st Cir. 1993)). In other words, an official who "knows of and disregards an excessive risk to inmate health" is deliberately indifferent. *Id.* (quoting *Farmer*, 511 U.S. at 837). This "deliberate indifference can include conscious and unjustified failure to relieve an inmate's physical pain." *Id.* at 27-28 (citing *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) ("[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment" (quoting *Whitney v. Albers*, 475 U.S. 312, 319 (1986)); *Kosilek*, 774 F.3d at 82 (citing *Estelle*, 429 U.S. at 103) ("Undue suffering, unrelated to any legitimate penological purpose, is considered a form of punishment proscribed by the Eighth Amendment").

Crucially, however, "prison officials lack the culpable mental state required for Eighth Amendment liability where, having actual knowledge of a 'substantial risk to

inmate health,' they 'respond[] reasonably to the risk.'" *Id.* at 28 (quoting *Farmer*, 511 U.S. at 844; *see also Kosilek*, 744 F.3d at 84. "Whether a given response to a substantial risk to inmate health is reasonable depends on whether it appropriately balances 'security and administrative concerns,'" *id.* (quoting *Cameron v. Tomes*, 990 F.2d 14, 20 (1st Cir. 1993)), with meeting the inmate's medical needs. For this reason, "even an outright 'denial of care' may not evince deliberate indifference if that decision is sufficiently justified by 'legitimate concerns' of prison administration such as 'institutional security.'" *Id.* (quoting *Kosilek*, 774 F.3d at 83; *see also Battista v. Clarke*, 645 F.3d 449, 454 (1st Cir. 2011) (explaining that if prison officials' "balancing judgments" between inmate medical need and "security considerations" are "within the realm of reason and made in good faith," withholding of desired medical care is not deliberate indifference).

**b. A Problem of Proof**

Applying these principles to Ms. Wood's claim, it is apparent that her Eighth Amendment claim cannot survive summary judgment. The problem is one of proof. Turning to the objective prong, Ms. Wood must present evidence that, when viewed in the light most favorable to her, her medical needs were "sufficiently serious," *Sosa*, 80 F.4th at 27, meaning a medical need that "has been diagnosed by a physician as mandating treatment," or is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.*

Ms. Wood was rearrested on February 22, 2018. DSMF ¶ 4; PRDSMF ¶ 4. She presented herself for medical care on a few occasions before March 29, 2018, but these

matters do not appear to be related to the problem that brought her to the hospital. Those problems instead began on March 29, 2018, when she reported that she was experiencing "nausea and upset stomach," and wrote that she "can't keep anything at all down . . .." DSMF ¶ 63; PRDSMF ¶ 63. Nurse Hunter saw Ms. Wood at 8:45 a.m. the following morning, March 30, 2018. DSMF ¶ 64; PRDSMF ¶ 64. Nurse Hunter examined Ms. Wood, including taking her orthostatic vital signs such as temperature, blood pressure, and heart rate. DSMF ¶ 64; PRDSMF ¶ 64. Nurse Hunter's March 30, 2018 examination of Ms. Wood revealed that she had indeterminate, somewhat conflicting signs; however, Nurse Hunter saw that Ms. Wood exhibited hand and foot tetany, or involuntary flexing of muscles, as well as signs and symptoms of hypovolemia, a state of low blood volume. DSMF ¶ 65; PRDSMF ¶ 65.

Nurse Hunter consulted with Julie Zales, the certified physician assistant, who prescribed an anti-nausea medicine called Zofran to Ms. Wood for a period of two days and Powerade or other electrolytic drinks for a period of three days. DSMF ¶ 66; PRDSMF ¶ 66. Physician Assistant Zales also ordered that a non-fasting comprehensive metabolic profile (CMP) be performed on Ms. Wood. DSMF ¶ 67; PRDSMF ¶ 67. According to Dr. Kathleen Knipscher, Ms. Wood's own medical expert, ordering a comprehensive medical profile was "very appropriate" under the circumstances. DSMF ¶ 68; PRDSMF ¶ 68. According to Dr. Knipscher, referring Ms. Wood to a PA was "an appropriate first step." DSMF ¶ 69; PRDSMF ¶ 69. Thus

far, the record fails to reveal any inappropriate PCJ response to Ms. Wood's complaints.

The following morning, March 31, 2018, CO Beth Trimm conducted a "med pass" for female inmates in the N Block of the PCJ. DSMF ¶ 70; PRDSMF ¶ 70. Ms. Wood felt too weak to come to the door, so CO Trimm asked the nurse on duty if she could bring Ms. Wood's medication to her. DSMF ¶ 70; PRDSMF ¶ 70. The nurse agreed, and CO Trimm handed Wood her medication along with a small cup of water. DSMF ¶ 70; PRDSMF ¶ 70. CO Trimm told Ms. Wood to take small sips of water, after which she instructed Ms. Wood to open her mouth so that CO Trimm could confirm that Ms. Wood had taken her medication. DSMF ¶ 71; PRDSMF ¶ 71.

Shortly after noon on March 31, 2018, an unidentified inmate in the N Block of the PCJ pushed an emergency call button and informed CO Maxine Bruton that Ms. Wood "looked like she was going to seize out." DSMF ¶ 72; PRDSMF ¶ 72. CO Bruton called other COs on her radio and told them to go check N Block. DSMF ¶ 72; PRDSMF ¶ 72. CO Trimm returned to N Block and found Ms. Wood being held upright by her roommate, Amanda Bushwood. DSMF ¶ 73; PRDSMF ¶ 73. Ms. Wood was pale, her breathing was labored, and she appeared to have a bluish color around her mouth. DSMF ¶ 73; PRDSMF ¶ 73.

Although CO Trimm was unsure whether this was a medical emergency, she nevertheless called the medical provider and the Shift Supervisor, CO Eric Tripp, who arrived shortly thereafter and checked Ms. Wood's pulse, which was weak. DSMF ¶ 74; PRDSMF ¶ 74. A nurse from the Jail medical clinic came to Ms. Wood's

room after CO Tripp and requested an ambulance for Ms. Wood. DSMF ¶ 75; PRDSMF ¶ 75. Bangor Fire & Rescue arrived at the PCJ shortly thereafter and transported Ms. Wood to the hospital. DSMF ¶ 75; PRDSMF ¶ 75. When she arrived at Eastern Maine Medical Center on March 31, 2018, Ms. Wood was diagnosed with rhabdomyolysis and related complications. DSMF ¶ 76; PRDSMF ¶ 76. The exact cause of Ms. Wood's rhabdomyolysis was uncertain. DSMF ¶ 79; PRDSMF ¶ 79.

Accepting the proposition that PCJ's care of Ms. Wood was appropriate through March 30, 2018, the next inflection point to locate any issue would be during the med pass in the morning of March 31, 2018, when CO Trimm was informed that Ms. Wood was too weak to come to the cell door for medication and CO Trimm called for a nurse to come to administer the medicine. Yet again, to this point, there is no suggestion of inappropriate PCJ care.

The focus of Ms. Wood's complaint turns to Nurse Bryan who apparently was the nurse who responded to CO Trimm's call. Ms. Wood describes an encounter with Nurse Bryan during which Nurse Bryan is openly skeptical of her symptoms and is markedly unpleasant to her. By Ms. Wood's account, Nurse Bryan told her that she was dehydrated and sent her back to her cell. Shortly after noon, after an inmate informed the Jail that Ms. Wood needed immediate medical attention, CO Trimm responded, later joined by CO Tripp, and they called a nurse, who called for an ambulance.

The timing of these events is not well spelled out in the record. At one point, Ms. Wood says that she was found unresponsive and in cardiac arrest about twelve

hours after she was returned to her cell. PSAMF ¶ 38; DRPSAMF ¶ 38. It is difficult to reconcile this estimate with the timing of the morning med pass and CO Trimm's first encounter with Ms. Wood, given that if the ambulance was called just after noon on March 31, 2018, twelve hours prior would have been just after midnight.

Regardless of the exact timing, the flaw in Ms. Wood's Eighth Amendment case is an absence of expert opinion. Ms. Wood has not produced any evidence that her medical condition in the morning of March 31, 2018 had already been "diagnosed by a physician as mandating treatment." *Sosa*, 80 F.4th at 27. To the contrary, it was not until she arrived at the EMMC that the diagnosis of rhabdomyolysis was determined. Nor is her condition during the morning of March 31, 2018 "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* A lay person would be concerned about Ms. Wood's vomiting and other symptoms, but the record reflects that Ms. Wood was in fact seen by nurses and a physician assistant was consulted. Nor does the record allow the finding that Nurse Bryan's reaction, which apparently was to believe that Ms. Wood was exaggerating and was dehydrated, was not justified based on what he saw.

Moreover, while the timing is unclear, even if Nurse Bryan erred in his assessment during the morning of March 31, 2018, shortly after noon, Ms. Wood was transported to the EMMC. There is nothing in the record to confirm that any delay (a matter of hours at most) in transporting Ms. Wood to the EMMC occasioned by Nurse Bryan's assumed error either caused her rhabdomyolysis, complicated her recovery, or prolonged her treatment at EMMC. What is clear is that by April 13,

2018, Ms. Wood thought she had recovered sufficiently to check herself out of the EMMC.

The medical evidence in the record is provided by Dr. Allison Keith, Dr. Raymond Baxter, Dr. Kathleen Knipscher, Dr. Jared Kasper, and Dr. Sophie Todd. None of those doctors expressed an expert opinion that Ms. Wood's care at PCJ was deficient, and, when asked, each expressly declined to offer a professional view about PCJ's treatment of Ms. Wood. Ms. Wood was not suffering from a medical condition, such as a broken bone, that a lay person can readily understand, and in light of the absence of expert opinion, the record does not allow her medical care claim to proceed. *Daggett v. York Cnty.*, No. 2:18-cv-00303-JAW, 2021 U.S. Dist. LEXIS 42845, at *108 (D. Me. Mar. 8, 2021) ("Even if there may be a case where expert medical testimony would not be necessary to prove a constitutional violation, it would have to be a situation where causation and state of mind fall within a layperson's competence"); *see also Griffin v. Hillsborough Cnty. Dep't of Corr.*, No. 13-cv-539-SM, 2015 U.S. Dist. LEXIS 84915, at *8 (D.N.H. May 28, 2015) (collecting cases for the proposition that "[w]hether expert testimony is necessary to prove deliberate indifference . . . depends on the nature of the specific issues in the particular case and what other evidence is available in the record").

There is therefore an insurmountable failure of proof on the first prong. There is no evidence that, based upon Ms. Wood's symptoms the morning of March 30, 2018, her condition was sufficiently serious when Nurse Bryan saw her to meet the requirements of the first prong and, even if it could be deemed sufficiently serious,

the delay of a matter of hours from Nurse Bryan's encounter to the ambulance taking her to the hospital demonstrates that, when her symptoms did become sufficiently serious, the PCJ called an ambulance and transported her to the EMMC.

There is a similar absence of proof on the second prong, the subjective element, which requires "sufficiently culpable state of mind" amounting to "deliberate indifference to the [inmate's] health or safety." *Sosa*, 80 F.4th at 27-28. To meet the deliberate indifference standard, prison officials must either deny "needed medical treatment in order to punish the inmate," or display "'wanton' or criminal recklessness in the treatment afforded." *Id.* Again, the only evidence that could conceivably reach this standard is Nurse Bryan's skepticism and failure to treat Ms. Wood in the morning of March 31, 2026, but as noted above, the delay in treatment was only a few hours and shortly after noon, Ms. Wood was on her way to the hospital. Even if viewing the record in the light most favorable to Ms. Wood, a factfinder could conclude that Nurse Bryan was mistaken, "[s]ubstandard treatment amounting to mere negligence or malpractice does not constitute deliberate indifference." *Daggett v. York Cnty.*, No. 2:18-cv-00303-JAW, 2021 U.S. Dist. LEXIS 42845, at *58 (D. Me. Mar. 8, 2021).

Thus, Ms. Wood's Eighth Amendment claim fails under both *Sosa* prongs.

**c. Municipal Liability**

"Municipal liability 'cannot be based on respondeat superior but requires independent liability based on an unconstitutional policy or custom of the municipality itself.'" *Ali Abdisamad v. City of Lewiston*, 960 F.3d 56, 60 (1st Cir.

2020) (quoting *Dirrane v. Brookline Police Dep't*, 315 F.3d 65, 71 (1st Cir. 2002)). In other words, "[*r*]*espondeat superior* or vicarious liability will not attach under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). "Rather, 'a plaintiff seeking to impose liability on a municipality under § 1983 . . . [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury.'" *Buchanan ex rel. Estate of Buchanan v. Maine*, 417 F. Supp. 2d 45, 65 (D. Me. 2006) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997)). "Thus, a plaintiff who brings a § 1983 action against a municipality bears the burden of showing that, 'through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged.'" *Haley v. City of Boston*, 657 F.3d 39, 51 (1st Cir. 2011) (quoting *Brown*, 520 U.S. at 404) (emphasis in *Brown*).

Another variety of municipal liability is a failure to train claim. *Id.* at 52. "Triggering municipal liability on a claim of failure to train requires a showing that municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberated indifference to the unconstitutional effects of those inadequacies." *Id.* (citing *Brown*, 520 U.S. at 407 and *City of Canton*, 489 U.S. at 387, 390 n.10).

There is nothing in the record before the Court that would allow a factfinder to conclude that PCJ adopted and promulgated an unconstitutional policy or custom or failed to properly train its employees and that any policy, custom, or lack of training caused or contributed to Ms. Wood's medical condition or PCJ's asserted

failure to properly diagnose and treat it. PCJ is entitled to judgment on the Eighth Amendment claim.

#### d. Supervisory Liability

"Supervisors are not liable for the unconstitutional acts of subordinates simply because of their supervisory authority". *Ross v. Polky*, No. 2:24-cv-00057-LEW, 2024 U.S. Dist. LEXIS 191381, at *6 (D. Me. Oct. 22, 2024). Instead, their liability must be based on their own acts or omissions, *Febus-Rodriguez v. Betancourt-Lebron*, 14 F.3d 87, 91-92 (1st Cir. 1994), which must reflect "reckless or callous indifference to the constitutional rights of others" and be affirmatively linked to the subordinate's unconstitutional behavior. *Id.* at 92. This involves both a sufficiently culpable state of mind on the part of the supervisor (more commonly referred to as a state of mind of "deliberate indifference") and a sufficiently causal relationship between the supervisor's indifference and the subordinate's wrongful conduct. *Board of the Cnty Comm'rs v. Brown*, 520 U.S. 397, 410-11 (1997) (describing deliberate indifference as "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action"); *Guadalupe-Báez v. Pesquera*, 819 F.3d 509, 515 (1st Cir. 2016) (describing causation as an essential element that "contemplates proof that the supervisor's conduct led inexorably to the constitutional violation") (quoting *Hegarty v. Somerset Cnty.*, 53 F.3d 1367, 1380 (1st Cir. 1995)); *Penate v. Hanchett*, 944 F.3d 358, 367 (1st Cir. 2019) ("A plaintiff must allege a strong causal connection, or an affirmative link between the behavior of a subordinate and the action or inaction of his supervisor . . . such that the supervisor's conduct led

inexorably to the constitutional violation.") (internal quotations and citations omitted). A plaintiff establishes deliberate indifference by showing "(1) grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) [the defendant's] failure to take easily available measures to address the risk." *Camilo-Robles v. Hoyos*, 151 F.3d 1, 7 (1st Cir. 1998).

Applying these standards to Ms. Wood's claims against Troy Morton, the Sheriff, and against the John Does to the extent they are supervisors, there is no evidence in this record that Ms. Wood has stated a supervisory liability claim against any of the individual Defendants.

**e. Conclusion: Medical Care Claim**

The Court concludes that the Defendants have demonstrated that on the Eighth Amendment medical care claim, there are no genuine issues of material fact, and they are entitled to summary judgment as a matter of law in their favor.

**C. Sexual Harassment Claim**

**1. Verbal and Other Harassment**

The Defendants' primary argument is that Ms. Wood's § 1983 claim cannot survive because she only alleged verbal, not physical, harassment. *Defs.' Mot.* at 21. "'The first inquiry in any § 1983 suit ... is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws' . . . Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law.'" *Trawalley v. N.H. Dep't of Corr. N. Nh. Corr. Facility*, No. 23-cv-00465-JL-TSM, 2025 U.S. Dist. LEXIS 276342, at *5-6 (D.N.H. Nov. 24, 2025)

(quoting *Santiago de Castro v. Morales Medina*, 943 F.2d 129, 130 (1st Cir. 1991) (quoting *Baker v. McCollan*, 443 U.S. 137, 140 146 (1979) (alterations in original))). If verbal harassment were all Ms. Wood had claimed, the Defendants would be correct. *Trawalley*, 2025 U.S. Dist. LEXIS 276342, at *6; *Hall v. Gregoire*, C.A. No. 17-228S, 2017 U.S. Dist. LEXIS 121680, at *5-6 (D.R.I. June 1, 2017); *Collins v Graham*, 377 F. Supp. 2d 241, 243-44 (D. Me. 2005) (holding that verbal harassment without physical injury does not give rise to § 1983 claim); *Duran v. Duval*, No. 96-10482-GAO, 1998 U.S. Dist. LEXIS 17431, at *8 (D. Mass. Oct. 28, 1998) ("it is settled that emotional damage by verbal harassment does not amount to an infringement of a constitutional right, and thus is not actionable under § 1983).

Ms. Wood, however, alleges more than just the unwanted sexual comments. Ms. Wood alleges that on multiple occasions at night, an unidentified male corrections officer would "feel up my whole body kind of slowly, like touching me . . . it just felt like he was copping a feel." DSMF ¶ 87; PRDSMF ¶ 87. The officer would touch and squeeze every inch of her body from head to toe, including her breasts and other sensitive body parts. PSAMF ¶ 19; DRPSAMF ¶ 19.

Ms. Wood's claim against this corrections officer is similar to *Vanetten v. Daigle*, No. 2:22-cv-00291-JDL, 2023 U.S. Dist. LEXIS 107746 (D. Me. June 22, 2023). In *Vanetten*, the inmate alleged that "Defendant Daigle inappropriately touched him three times." *Id.* at *10. The district court observed that "sexual assault occurs when 'a prison staff member, acting under color of law and without legitimate penological justification, touches the prisoner in a sexual manner or otherwise engages in sexual

conduct for the staff member's own sexual gratification, or for the purpose of humiliating, degrading, or demeaning the prisoner.'" *Id.* (quoting *Covington v. Paris*, No. 19-cv-384-JD, 2021 U.S. Dist. LEXIS 72814, at *3 (D.N.H. Apr. 15, 2021) (quoting *Bearchild v. Cobban*, 947 F.3d 1130, 1144 (9th Cir. 2020))). The district judge concluded that "Plaintiff has alleged an actionable federal claim against Defendant Daigle." *Id.* There is very little light, if any, between *Vanetten* and Ms. Wood's case.

Ms. Wood also claimed that another unidentified corrections officer spied on her at least three times while she was showering. PSAMF ¶ 31; DRPSAMF ¶ 31. The parties did not provide the Court with any authority about this type of invasion of privacy.

The Court located one case, *Yahtues v. Dionne*, No. 16-cv-174-SM, 2020 U.S. Dist. LEXIS 166865, *3-12 (D.N.H. Aug. 17, 2020), where a court discussed jail staff members observing members of the opposite sex while they were showering. *Yahtues*, as here, involved a pre-trial detainee, and the district court engaged in a discussion of the complex balance between inmate privacy and institutional safety. *Id.* *Yahtues* quoted the United States Supreme Court as saying that such a detainee "simply does not possess the full range of freedoms of an unincarcerated individual." *Id.* at *6 (quoting *Bell v. Wolfish*, 441 U.S. 520, 546 (1979)). Rather, a detainee's rights must be balanced against "[t]he fact of confinement as well as the legitimate goals and policies of the penal institution." *Id.* The court's function in this type of case is to seek a "mutual accommodation" between the detainee's rights and the restrictions of jail. *Id.* All restrictions on inmate rights "must be evaluated in light of the central

objective of prison administration, safeguarding institutional security." *Id.* at 547. "In general, the law gives wide-ranging deference to prison officials' decisions concerning the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Yahtues*, 2020 U.S. Dist. LEXIS 166865, at *6-7 (citing *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them")). When a prison practice "impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89 (1987).

It might be anticipated that in a prison, corrections officers performing their duties might have glimpses of an inmate's naked body in a cell, shower, or otherwise. *See Brown v. Plata*, 563 U.S. 493, 511 (2011) ("Courts must be sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals"). But here, the allegation is that the corrections officer stared at Ms. Wood on multiple occasions while she was in the shower and made comments about her body while doing so. It is difficult to imagine a legitimate penological justification for the corrections officer's actions.

Although not a perfect analogy because looking at a person is not the same as conducting a search, § 1983 caselaw on strip searches provides a useful referent. "[C]onvicted prisoners and pretrial detainees retain constitutional rights despite their incarceration, including basic Fourth Amendment rights against unreasonable searches and seizures." *Hanson v. Church*, No. 11-cv-534-PB, 2012 U.S. Dist. LEXIS 18585, at *14 (D.N.H. Jan. 12, 2012) (quoting *Roberts v. Rhode Island,* 239 F.3d 107, 109 (1st Cir. 2001) (citing *Bell*, 441 U.S. at 545)). What seems relevant to both a strip search and visual inspection is that the First Circuit has applied "the balancing test set forth in *Bell* to evaluate the reasonableness of a strip search or visual body cavity search, in the prison context." *Id.* (citing *Roberts*, 239 F.3d at 110 (citing *Bell*, 441 U.S. at 545-46)).

Applying this analysis, the court must balance "the need for the particular search against the invasion of personal rights that the search entails," considering "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it and the place in which it is conducted." *Id.* (quoting *Bell*, 441 U.S. at 559); *see also United States v. McGhee*, 627 F.3d 454, 457 (1st Cir. 2010) (sentence vacated on unrelated grounds at 651 F.3d 153 (1st Cir. 2011)) ("as a search extends beyond a pat down and the removal of outer garments, shoes and socks, the case law has required increasing justification for more intrusive measures"); *Swain v. Spinney*, 117 F.3d 1, 7 (1st Cir. 1997) (officers must have reasonable suspicion that particular detainee is in possession of contraband before conducting strip search).

From Ms. Wood's allegations, this corrections officer had no legitimate need to watch her shower and was instead watching her for his own sexual gratification. Whatever may be said of his conduct, absent some plausible legitimate explanation, PCJ did not hire the corrections officer to stare at female inmates while they were showering. At the same time, the Court understands that the Defendants are in a difficult position to defend these allegations because Ms. Wood did not complain about the corrections officer's actions when they occurred, she has not even now identified the officer who engaged in this conduct, and these events took place over eight years ago. Thus, it strikes the Court that Ms. Wood has not supplied the Defendants with information sufficient for them to identify the incident with specificity and provide the Court with a penological justification, if one existed.[132] If the officer caught glimpses of Ms. Wood in the shower while he was making rounds at night and made some improper comments about her, but never otherwise harassed or touched her, it is doubtful that her claim could go forward. Not every glimpse of an inmate's naked body can be grounds for a federal case.

On the other hand, if the officer lingered by the shower on multiple occasions, stared at her for extended periods, and made remarks about her body, her claim

[132] Ms. Wood filed a request for production of documents that asked the Defendants to produce documents to identify the names of guards at PCJ in 2018 when she was incarcerated there. *See* DRPSAMF, Attach. 4. *Defs.' Resp. to Pl.'s Second Req. for Production of Docs.* at 1-7. The Defendants objected on the grounds that the request was overbroad, unduly burdensome, not relevant to the claims and defenses in the case, and not proportional to the discovery needs in the case. *Id.* at 3-4. The Court is dubious about the Defendants' objections and refusal to produce any records. The Court suspects that if Ms. Wood had followed Local Rule 26(c), the Defendants would have been required – within some limits and protections – to produce the names of these corrections officers and perhaps some identifying information, such as photographs, so that Ms. Wood could attempt to identify both these officers.

survives summary disposition because there is no legitimate reason for doing those things. The Court is concerned that an inmate could make out a federal case against an officer based on the inmate's own, uncorroborated allegations of visual aggression, especially in the absence of any contemporaneous grievance. Nevertheless, given the directive to view contested facts in the light most favorable to Ms. Wood, the Court concludes that these allegations survive the Defendants' motion for summary judgment as against the officer in his personal capacity.

Ms. Wood alleges that one unidentified female corrections officer made sexual comments to her during two strip searches. But the strip searches occurred when she returned from court or from a visit, and she does not allege that the strip searches were contrary to PCJ policy. She alleges that the corrections officer performed a more intensive strip search than other officers, but there is no allegation that the corrections officer touched Ms. Wood during these searches. In all, the Court concludes that these searches do not meet the standards for a § 1983 action.

Ms. Wood makes some other allegations, such as being asked to hold up a towel while a corrections officer and an inmate engaged in sex, being propositioned by a corrections officer for sex in exchange for food, and being stared at while she was in the hospital in her hospital gown. However unprofessional, none of these incidents involve physical contact or more than an isolated and short event. The Court concludes that none of these allegations survive summary judgment.

In short, Ms. Wood may maintain her § 1983 claims against the two John Doe defendants, who were employed at the PCJ, but only in their personal capacities since

they were "personally involved in a violation of [her] constitutional rights." *Tes v. Oracle Am., Inc.*, 25-cv-12350-LTS, 2026 U.S. Dist. LEXIS 133279, at *4-5 (D. Mass. Mar. 31, 2026) (citing *Hafer v. Melo*, 502 U.S. 21, 31 (1991)).

**2. Claims Against Penobscot County Jail**

Ms. Wood has impleaded two named defendants: Troy Morton, the Penobscot County Sheriff, and the Penobscot County Jail. Regarding her claims against Sheriff Morton, the general rule is that "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution. *Id.* The mere fact that Plaintiff has alleged a plausible § 1983 claim against one or more individual Defendants thus does not result in potential liability for Defendants Sheriff Morton and the PCJ. Here, there is no evidence in the record that Sheriff Morton took any actions at all regarding Ms. Wood's period of incarceration and therefore her claim against him must fail.

Similarly, "although a [state governmental entity] may not be held liable under a theory of respondeat superior for an employee's constitutional violation, it may be held liable when 'execution of [the entity's] policy or custom . . . inflicts the injury' and is the 'moving force' behind the [inmate's] constitutional violation." *Vanetten*, 2023 U.S. Dist. LEXIS 107746, at *11-12 (quoting *Saldivar v. Racine*, 818 F.3d 14, 20 (1st Cir. 2016) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978))). The

Penobscot County Sheriff's Department has presented evidence that its written policies forbid the type of sexual misconduct by corrections officers against inmates that Ms. Wood is alleging, and Ms. Wood has not identified a PCJ policy or custom that resulted in her deprivation of constitutional rights.

Ms. Wood's claims against Sheriff Morton and PCJ must fail.

## VII. UNNAMED DEFENDANTS

By the Court's reckoning, the only claims that survive summary judgment are claims against two John Doe guards in their personal capacities, one who repeatedly physically touched Ms. Wood while she was sleeping and another who stared at her on at least three occasions while she was showering for no apparent penological reason. The remaining claims must be dismissed.

Despite the availability of discovery during the discovery period, Ms. Wood has not identified either of these two corrections officers. In her filings regarding the corrections officer who touched her at night, Ms. Wood says that she knew this corrections officer's name during her incarceration in 2018 but can no longer remember it. DSMF ¶ 88; PRDSMF ¶ 88. As for the corrections officer who repeatedly stared at her while she was showering, Ms. Wood describes this officer as unidentified. DSMF ¶ 90; PRDSMF ¶ 90.

These events took place over six years ago and Ms. Wood has conceded that she did not file a grievance against either corrections officer. DSMF ¶ 89; PRDSMF ¶ 89; DSMF ¶ 93; PRDSMF ¶ 93. The Court does not know how Ms. Wood will be able to identify these corrections officers, but as the six-year statute of limitations

period has now run against the two officers, if the Court were to dismiss the claims because the officers have not been named or served, Ms. Wood's claims against them would be barred even if she subsequently discovered their names.[133] At the same time, the Court will not hold her claims against these unknown officers in abeyance forever.

To resolve this issue, the Court will allow a renewed period of discovery not extending beyond January 25, 2027 to allow Ms. Wood to discover the names of these officers. If she is unable to confirm the names of the officers during that period or satisfy the Court that discovery is likely to reveal those names, the Court will dismiss her lawsuit. If she is able to do so, the Court will allow Ms. Wood to amend the complaint to name the defendants by name, and the case will proceed accordingly.

## VIII. CONCLUSION

The Court GRANTS the Defendants' Motion for Summary Judgment (ECF No. 74) as to Defendants Penobscot County Jail and Sheriff Troy Morton and DENIES it as regards the sexual harassment claims against two corrections officers as yet unknown to the Plaintiff. The Court ORDERS the parties to file a status report by January 25, 2027.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 23rd day of November, 2026

133 The claims against these corrections officers may be time-barred. *See Singletary v. Pennsylvania*, 266 F.3d 186 (3d Cir. 2001), *but see Plourde v. Lewis*, 1:23-cv-00323-JAW, 2025 U.S. Dist. LEXIS 42310 (D. Me. Mar. 10, 2025). The issue is not yet before the Court.